IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:19-cv-00091-KDB

**IN RE:**

**LIANA SUE CONKLIN,**

Debtor.

---

**KEVIN JUBER and LINDA JUBER,**

Appellants,

vs.

**LIANA SUE CONKLIN**,

Appellee.

---

**********************************************

**BRIEF OF APPELLANTS KEVIN JUBER AND LINDA JUBER**

**********************************************

Kevin and Linda Juber, Appellants, submit this brief in support of their appeals in consolidated cases 3:19-cv-00091-KDB and 3:19-cv-00443-KDB from the judgment entered in favor of the Appellee Liana Sue Conklin by the United States Bankruptcy Court for the Western District of North Carolina.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. i

JURISDICTIONAL STATEMENT ...................................................... 1

ISSUES PRESENTED ....................................................................... 1

STANDARD OF REVIEW ................................................................... 2

STATEMENT OF THE CASE ............................................................ 2

A. Christopher Juber and Liana Conklin's Relationship ....... 2

B. The Creation of the Initial Loan ........................................ 3

C. The End of the Engagement & What Followed. ................ 5

D. The Jubers and Liana Conklin Execute a Signed Promissory Note ............................................................ 5

E. Procedural History ............................................................. 7

SUMMARY OF THE ARGUMENT .................................................... 9

ARGUMENT AND CITATION OF AUTHORITY ............................. 10

I. Under the Plain Language of 11 U.S.C. § 523(a)(8)(B), the Jubers' Loan to Ms. Conklin is a Qualified Education Loan that is Nondischargeable ....................................... 10

A. Statutory Language of 11 U.S.C. § 523(a)(8) ........... 10

B. Interpretation of the Plain Language and Common, Ordinary Meaning of "Refinance" ...... 12

C. The Fourth Circuit's Recent *En Banc* Decision in *In re Hurlburt* Supports the Jubers' Position 16

II. Courts Have Held That Similar Loans Are Qualified Education Loans Under 11 U.S.C. § 523(a)(8)(B) ......... 20

III. The Bankruptcy Court Imposed a Set of Criteria and Tests That Are Not Supported by the Plain Language of the Statute ........ 26

IV. The Cases Relied Upon by the Bankruptcy Court Are Distinguishable ........ 30

V. The "Substance of the Transaction" Test Does Not Apply ........ 33

VI. The Jubers Are Entitled to an Award of Their Attorneys' Fees, Costs, and Expenses as Provided In the Promissory Note ........ 37

CONCLUSION ........ 37

CERTIFICATE OF COMPLIANCE ........ 38

APPENDIX ........ A-1

## TABLE OF AUTHORITIES

**Cases**

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) .................... 12

*Benson v. Corbin (In re Corbin)*, 506 B.R. 287 (Bankr. W.D. Wash. 2014) .................... 22

*Brown v. Rust (In re Rust)*, 510 B.R. 562 (Bankr. E.D. Ky. 2014) .................... 22

*CWCapital Asset Mgmt. v. Burcam Capital*, No. 5:13-CV-278-F, 2014 U.S. Dist. LEXIS 87900 (E.D.N.C. June 24, 2014) .......... 2

*De La Rosa v. Kelly (In re Kelly)*, 582 B.R. 905 (Bankr. S.D. Tex. 2018) .................... 22

*DePasquale v. Bos. Univ. Sch. of Dentistry (In re DePasquale)*, 225 B.R. 830 (B.A.P. 1st Cir. 1998) .................... 34, 35

*Doyle v. Creeger (In re Creeger)*, Nos. 14-34053, 15-3023, 2016 Bankr. LEXIS 2076 (Bankr. N.D. Ohio May 20, 2016) ..... 25, 26

*Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393 (4th Cir. 2005) .................... 2

*Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134 (2018) ....... 19

*Essangui v. SLF V-2015 Tr. (In re Essangui)*, 573 B.R. 614 (Bankr. D. Md. 2017) .................... 10

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33 128 S. Ct. 2326, 2339 (2008) .................... 20

*Golden v. JP Morgan Chase Bank (In re Golden)*, 596 B.R. 239 (Bankr. E.D.N.Y. 2019) .................... 11, 30, 31

*Homaidan v. SLM Corp. (In re Homaidan)*, 596 B.R. 86 (Bankr. E.D.N.Y. 2019) .................... 32

*Hurlburt v. Black (In re Hurlbert)*, 925 F.3d 154, 2019 U.S. App. LEXIS 15551 (4th Cir. May 24, 2019) .................... passim

*Hurlburt v. Black (In re Hurlburt)*, 572 B.R. 160 (Bankr. E.D.N.C. 2017) .................... 17

*In re Nies*, 334 B.R. 495, 2005 Bankr. LEXIS 2407, at *16-18 (Bankr. D. Mass. 2005) .......................................... 33, 34, 35, 36

*In re Oliver*, 499 B.R. 617 (Bankr. S.D. Ind. 2013) ......... 30, 31, 32

*Johnson v. Mo. Baptist Coll. (In re Johnson)*, 215 B.R. 750 (Bankr. E.D. Mo. 1997) ............................................................ 34

*Johnson v. Mo. Baptist Coll. (In re Johnson)*, 218 B.R. 449 (B.A.P. 8th Cir. 1998) ........................................................ 34, 36

*Kashikar v. Turnstile Capital Mgmt., LLC (In re Kashikar)*, 567 B.R. 160 (B.A.P. 9th Cir. 2017) ............................................... 33

*Kofa v. United States INS*, 60 F.3d 1084 (4th Cir. 1995) ........... 15

*Manion v. Modeen (In re Modeen)*, No. 17-119547-7, 17-71, 586 B.R. 298, 2018 Bankr. LEXIS 1701 (Bankr. W.D. Wis. June 8, 2018) ........................................................................ 23

*Miller v Gomez*, No. 17-61024, 2017 Bankr. LEXIS 4078 (Bankr. D. Or. Nov. 29, 2017) ......................................................... 21, 22

*Milner v. Dep't of Navy*, 562 U.S. 562 (2011) ............................. 19

*Morrison v. Astrue*, No. 3:09cv536, 2011 U.S. Dist. LEXIS 36666 (W.D.N.C. Mar. 31, 2011) ......................................................... 21

*North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 515 F.3d 344 (4th Cir. 2008) ...................................................................... 12

*Ramani v. Romo (In re Romo)*, No. 17-21440, No. 17-2107, 2018 Bankr. LEXIS 1448 (Bankr. E.D. Mich. May 14, 2018) .... 23, 24

*Salgado v. Pastor (In re Pastor)*, No. 16-23969, 17-01067, 2018 Bankr. LEXIS 1973 (Bankr. S.D. Fla. June 28, 2018) ...... 24, 25

*Stephens v. Astrue*, 565 F.3d 131 (4th Cir. 2009) ....................... 12

*Swenson v. Swenson*, No. 16-10016, 2016 Bankr. LEXIS 3117 (Bankr. W.D. Wis. Aug. 22, 2016) ............................................ 26

*Tankersley v. Almand*, 837 F.3d 390 (4th Cir. 2016) ................. 13

*United States DHHS v. Smitley*, 347 F.3d 109 (4th Cir. 2003) .... 2

*United States v. Hatcher*, 560 F.3d 222 (4th Cir. 2009) ............. 19

*United States v. Menasche*, 348 U.S. 528 (1955) .......................... 15

*United States v. Passaro*, 577 F.3d 207 (4th Cir. 2009) ............ 12

*United States v. Rodgers*, 466 U.S. 475 (1984) .......................... 29

*Wiley v. Wells Fargo Bank, N.A. (In re Wiley)*, 579 B.R. 1 (Bankr. D. Me. 2017) .......................................................... 18

*Witt v. United Cos. Lending Corp. (In re Witt)*, 113 F.3d 508 (4th Cir. 1997) .......................................................... 17

### Statutes

11 U.S.C. § 1322 .......................................................... 17
11 U.S.C. § 1322(b)(1) .......................................................... 1, 7
11 U.S.C. § 1322(c)(2) .......................................................... 17, 18
11 U.S.C. § 1325(a)(1) .......................................................... 7
11 U.S.C. § 1325(a)(5)(B) .......................................................... 18
11 U.S.C. § 523 .......................................................... 10
11 U.S.C. § 523(a) .......................................................... 15, 33
11 U.S.C. § 523(a)(8) .......................................................... passim
11 U.S.C. § 523(a)(8)(A) .......................................................... passim
11 U.S.C. § 523(a)(8)(A)(i) .......................................................... 10, 11
11 U.S.C. § 523(a)(8)(A)(ii) .......................................................... passim
11 U.S.C. § 523(a)(8)(B) .......................................................... passim
26 U.S.C. § 221(d) .......................................................... passim
26 U.S.C. § 221(d)(1) .......................................................... passim
26 U.S.C. § 221(d)(1)(A) .......................................................... 26
26 U.S.C. § 221(d)(1)(A)-(C) .......................................................... 24
26 U.S.C. § 221(d)(1)(C) .......................................................... 25
26 U.S.C. § 267(b) .......................................................... 14, 15, 24
26 U.S.C. § 707(b)(1) .......................................................... 14, 15, 24
28 U.S.C. § 1334 .......................................................... 1
28 U.S.C. § 158(a) .......................................................... 1
28 U.S.C. §§ 157(b)(2)(I) & (J) .......................................................... 1

### Other Authorities

Black's Law Dictionary (10th ed.) .......................................................... 22
Black's Law Dictionary (11th ed. 2019) .......................................................... 13, 14

### Rules

Federal Rule of Bankruptcy Procedure 8002(a)(2) .......................... 8
Federal Rule of Bankruptcy Procedure 8014(a)(10) .................... 38
Federal Rule of Bankruptcy Procedure 8015(a)(7)(B) ................ 38

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1334. This matter is a core proceeding as defined by 28 U.S.C. §§ 157(b)(2)(I) and (J), as it involves the determination of the dischargeability of a debt and an objection to discharge. The judgment entered by the bankruptcy court on August 26, 2019 is a final order under 28 U.S.C. § 158(a).

## ISSUES PRESENTED

The Bankruptcy Code, 11 U.S.C. § 523(a)(8)(B), excepts from discharge any education loan that is a "qualified education loan," as defined in Section 221(d)(1) of the Internal Revenue Code. Section 221(d)(1) defines a "qualified education loan," in part, as any indebtedness used to refinance indebtedness which is a qualified education loan. As defined, a qualified education loan does not include indebtedness owed to a person who is related to the debtor. The Jubers paid off three of Ms. Conklin's private loans that were undisputedly qualified education loans. Ms. Conklin agreed verbally and in a later, signed promissory note to repay the Jubers. Ms. Conklin is not related to the Jubers.

Is the loan to Ms. Conklin from the Jubers a refinance of indebtedness which qualifies as a qualified education loan and therefore nondischargeable in Ms. Conklin's Chapter 13 bankruptcy?

Furthermore, if the debt is nondischargeable as a qualified education loan, does the Confirmation of the Plan unfairly discriminate against and cause prejudice to the Jubers' claim in violation of 11 U.S.C. § 1322(b)(1)?

## STANDARD OF REVIEW

In an appeal from a bankruptcy court's order, the district court reviews the bankruptcy court's legal conclusions de novo and its factual findings for clear error. *Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 398 (4th Cir. 2005). When a case requires a conclusion regarding the legal effect of a bankruptcy court's factual findings, it presents a mixed question of law and fact. *United States DHHS v. Smitley*, 347 F.3d 109, 115 (4th Cir. 2003) (quotation omitted). District courts review mixed questions of law and fact in bankruptcy appeals under a hybrid approach: "the ultimate conclusion of law is reviewed de novo but the supporting factual findings are reviewed for clear error." *CWCapital Asset Mgmt. v. Burcam Capital*, No. 5:13-CV-278-F, 2014 U.S. Dist. LEXIS 87900, at *7 (E.D.N.C. June 24, 2014) (citing *Smitley*, 347 F.3d at 116).

## STATEMENT OF THE CASE

### A. Christopher Juber and Liana Conklin's Relationship.

Kevin and Linda Jubers' son, Christopher, and the debtor, Liana Conklin, met their freshman year of college. (RB 50 pp 10, 102).[1] They attended the University of New Haven in Connecticut. (RB 14 p 13). Christopher Juber and Ms.

[1]The parties agreed upon a joint consolidated Record on Appeal. (Consent Orders, ECF No. 76 in the Chapter 13 Proceeding; ECF No. 59 in the Adversary Proceeding). The consolidated Record on Appeal contains documents from the Chapter 13 proceeding and the Adversary Proceeding in chronological order. For ease of reference, each document will be identified by the number indicated in the Index to the consolidated Record on Appeal: "RB," for "Record Binder," and the page number.

Conklin dated for six years, prior to their engagement in December 2014. (RB 50 pp 9-10).

Christopher Juber and Ms. Conklin primarily paid their own expenses while they dated, but Christopher paid off two of Ms. Conklin's credit cards, a Walmart card and a Discover card, during this time to try to give her a fresh start. (RB 50 pp 122, 155-56).

**B. The Creation of the Initial Loan.**

When the Jubers learned of their son's engagement to Ms. Conklin, they also learned that Ms. Conklin had approximately $100,000 in student loan debt from college. (RB 50 p 11). Ms. Conklin did not pay directly for any of her education. (RB 14 p 14).

The Jubers wanted to help the couple start their married life in a strong financial position. (RB 50 p 13). For this reason, the Jubers offered to refinance Ms. Conklin's three private student loans on more favorable terms. (RB 50 pp 13-16).

The Jubers had an existing home equity line of credit that had been in place since they had refinanced their home in 2014. (RB 50 p 14; RB 60 pp 4-9). The home equity line of credit had not been activated. (RB 50 pp 14-15). The terms of the home equity line of credit were twelve months at 1.99%. (RB 50 p 15; RB 60 p 4). The weighted average of Ms. Conklin's three private student loans was 9.3%. (RB 50 p 12). The Jubers offered to activate their home equity line of credit to pay off Ms. Conklin's three private student loans, and thereby help her reduce the

amount of interest so that she could pay more of the principal balance. (RB 50 p 16).

Ms. Conklin provided the amounts of each private student loan to Kevin Juber via email on February 16, 2015. (RB 15 pp 104-105). Those amounts were: $40,710.12 to Great Lakes Higher Education Corporation; $24,768.77 to Firstmark Services; and $23,657.53 to Chase Student Loans. (RB 15 p 105). The Jubers activated their home equity line of credit, transferred $89,136.42 from the line of credit into their checking account, and then, from their checking account, paid off each of the three loans in full. (RB 50 pp 25-26; RB 14 pp 113-17).

Kevin Juber informed Ms. Conklin via text message that payment for the three loans had been sent. (RB 60 p 14). Ms. Conklin responded, "Awesome! Thank you SO much." (RB 60 p 15). Kevin Juber informed Ms. Conklin that the first payment was due on March 24th. (RB 60 p 15). At Ms. Conklin's request, Christopher helped her set up recurring payments from her checking account. (RB 50 p. 116). Christopher Juber was never responsible for paying the loan. (RB 50 p 116). The parties understood that the Jubers' payment of Ms. Conklin's three private student loans and her agreement to repay the Jubers was a loan. (RB 50 p 137). The Jubers expected to be repaid, and Ms. Conklin agreed to repay them in full. (RB 50 pp 137-38). Ms. Conklin made $500 payments every two weeks, beginning March 10, 2015 and ending November 13, 2015. (RB 6 pp 5-6; RB 14 p 27; RB 60 pp 71-87).

**C. The End of the Engagement & What Followed.**

Ms. Conklin abruptly broke off her engagement to Christopher Juber one month before the wedding. (RB 50 p 126). Christopher Juber called Linda Juber to tell her, and she informed Kevin Juber (RB 50 p 34; RB 60 p 21). Ms. Conklin emailed the Jubers stating that she "appreciate[d] everything [they] ha[d] done for [her] over the years," and "I will of course continue to pay the loan and completely reimburse you for the reception hall deposit and any other costs you incurred." (RB 60 p 21). The Jubers communicated with Ms. Conklin via email about the logistical issues such as returning wedding gifts, canceling the reception, notifying the ministers and organist, and canceling the photographer and DJ. (RB 14 p 127). As for Ms. Conklin's offer to reimburse the Jubers for the reception deposit, Kevin Juber stated "let's put that off to the side for now." (RB 14 p 127).

**D.    The Jubers and Liana Conklin Execute a Signed Promissory Note.**

In addition to addressing the logistical issues arising from breaking off the engagement, the Jubers and Ms. Conklin corresponded about how to handle the loan which refinanced Ms. Conklin's private student loans. (RB 60 p 22).

In his email dated November 17, 2015, Kevin Juber sent Ms. Conklin a draft promissory note. (RB 60 pp 22-23). Ms. Conklin wanted to obtain other financing to repay the loan to the Jubers. (RB 14 p 131). She emailed Kevin Juber, "I will absolutely sign a Promissory Note claiming responsibility for the loan however I am unable to sign one with the deadline of December 31st as I may not have obtained financing by that date." (RB 14 p 131). Kevin Juber and Ms. Conklin exchanged

several versions of the written promissory note. (RB 60 pp 27-60). Ms. Conklin requested changes to the promissory note, which Kevin Juber made. (RB 60 p 59). Ms. Conklin talked to her parents about the written promissory note but did not consult a lawyer. (RB 50 p 148). Ms. Conklin contemplated having her parents co-sign the promissory note, but they did not do so. (RB 50 p 84; RB 60 p 164).

The parties finally agreed to and entered into a Promissory Note on December 2, 2015. (RB 60 pp 53-58). The Promissory Note stated Ms. Conklin promised to pay the Jubers the principal sum of $80,820.18 with interest at 9.5% per annum. (RB 60 pp 53-58). The Promissory Note provided for monthly payments beginning December 20, 2015 until paid in full. (RB 60 p 53). The Promissory Note provided that in the event of default, Ms. Conklin, as Borrower, would pay all costs and expenses incurred because of the default, including reasonable attorneys' fees. (RB 60 pp 53-54).

In June 2017, the Jubers sold their home and paid the home equity line of credit in full at the closing. (RB 50 pp 31-32).

Ms. Conklin made the payments pursuant to the promissory note timely and did not request accommodation in changing the date or amount of the payment. (RB 50 p 59). The Jubers did not receive Ms Conklin's loan payment in February 2018. (RB 50 p 59). On March 2, 2018, Ms. Conklin emailed the Jubers, notifying them that she had filed for Chapter 13 bankruptcy. (RB 50 p 60; RB 60 p 113).

The Jubers did not prepare and provide IRS Form 1098, documenting interest on student loans, to Ms. Conklin, because they were unaware that they

should do so.  (RB 50 pp 63-64).  At the instruction of their lawyer, the Jubers prepared the IRS Form 1098, but have not provided the forms pending the outcome of this litigation. (RB 50 pp 64-65).

### E.    Procedural History

Ms. Conklin filed her Voluntary Petition for Chapter 13 Bankruptcy on February 20, 2018.  (RB 1).  The Jubers filed an unsecured proof of claim in the amount of $69,136.40 and stated in it that the basis of the claim was "Loan provided to refinance student loans."  (RB 5 p 2).  The Jubers objected to confirmation of the debtor's Chapter 13 plan, contending that her proposed plan unfairly discriminated against the Jubers by proposing to pay during the Chapter 13 plan full contractual monthly educational loan repayments directly to the U.S. Department of Education while at the same time making payments on the Jubers' educational loan inside the plan, pro rata with other general unsecured creditors, in violation of 11 U.S.C. § 1322(b)(1).  (RB 1 pp 26-29; RB 5 p 2). Ms. Conklin's Schedule J shows the direct payment to the U.S. Department of Education in the amount of $312.55 per month. (RB 1 p 29).  The Jubers contended that 11 U.S.C. § 1325(a)(1) prohibited confirmation and that the plan was not proposed in good faith.  (RB 5 pp 2-3).

On April 25, 2018, the Jubers filed an adversary complaint, asking the bankruptcy court to declare their loan to Ms. Conklin nondischargeable as a qualified education loan under 11 U.S.C. § 523(a)(8)(B).  (RB 6).  On August 18, 2018, the bankruptcy court entered an order conditionally confirming Ms. Conklin's Chapter 13 plan, subject to the court's later ruling in the adversary proceeding.  (RB

17). Under the order confirming the plan, the debtor's payments and term were established at $900.00 monthly for 60 months. (RB 17).

The Jubers moved for partial summary judgment in the adversary proceeding on October 3, 2018, contending that the three private student loans Ms. Conklin owed to Great Lakes, Firstmark, and Chase were "qualified education loans," as defined in 26 U.S.C. § 221(d)(1). (RB 18). The bankruptcy court granted the Jubers' motion for partial summary judgment on December 3, 2018, holding that Ms. Conklin's private student loans were "qualified education loans" under 11 U.S.C. § 523(a)(8)(A). (RB 27).

The bankruptcy court held a trial in the adversary proceeding on January 25, 2019. (RB 50). The bankruptcy court verbally ruled on February 7, 2019, that Ms. Conklin's debt to the Jubers was not a "qualified education loan" under 11 U.S.C. § 523(a)(8)(B) and was therefore dischargeable. (RB 51). The Jubers filed a notice of appeal in the adversary proceeding on February 21, 2019, on the basis that the bankruptcy court's verbal ruling was a final order, although the written judgment, order or decree had not been entered. (RB 57). This notice of appeal was entered on the docket on February 21, 2019, but was not deemed "filed" until August 26, 2019, pursuant to Federal Rule of Bankruptcy Procedure 8002(a)(2). (RB 57).[2] The Jubers also filed a notice of appeal in the Chapter 13 proceeding on February 21, 2019. (RB 37).

---

[2]Federal Rule of Bankruptcy Procedure 8002(a)(2) provides that "[a] notice of appeal filed after the bankruptcy court announces a decision or order—but before entry of the judgment, order, or decree—is treated as filed on the date of and after the entry." Fed. R. Bankr. P. 8002(a)(2).

The bankruptcy court entered final Judgment and its written Findings of Fact, Conclusions of Law, and Order Granting Judgment to the Defendant on August 26, 2019. (RB 58; RB 59).

## SUMMARY OF THE ARGUMENT

The bankruptcy court entered its written judgment and findings of fact and conclusions of law on August 26, 2019. In its written order, the bankruptcy court made a results-oriented decision based on what it described as "uncommon facts." The bankruptcy court attributed ill will and an "ulterior motive" to the Jubers, who in fact were generous in attempting to help both Ms. Conklin and their son. For her part, Ms. Conklin knowingly accepted the benefit of the refinance prior to her bankruptcy. The bankruptcy court strained to reach its results-oriented decision by imposing a set of criteria and tests that are not supported by the plain meaning of the statute.

Courts must first look to the plain meaning of the statute. In this case, the inquiry begins with the common, ordinary definitions of the terms "refinance" and "indebtedness." Because the Jubers' loan to Ms. Conklin is "indebtedness used to refinance indebtedness which qualifies as a qualified education loan," under 11 U.S.C. § 523(a)(8)(B) and 26 U.S.C. § 221(d)(1), the debt is nondischargeable in Ms. Conklin's Chapter 13 proceeding. The inquiry stops there.

## ARGUMENT AND CITATION OF AUTHORITY

### I. Under the Plain Language of 11 U.S.C. § 523(a)(8)(B), the Jubers' Loan to Ms. Conklin is a Qualified Education Loan that is Nondischargeable.

The Bankruptcy Code, 11 U.S.C. § 523, contains categories of debt that are not dischargeable in bankruptcy proceedings. The section at issue here, 11 U.S.C. § 523(a)(8), addresses student loans. The specific subsection, Section 523(a)(8)(B), incorporates by reference § 221(d) of the IRS Code, which defines a "qualified education loan" in part as "indebtedness used to refinance indebtedness which qualifies as a qualified education loan." Under the common, ordinary meaning of "refinance," the Jubers' payment of Ms. Conklin's three private loans—and her agreement to repay the debt—is a "qualified education loan" that is nondischargeable in Ms. Conklin's Chapter 13 proceeding.

#### A. Statutory Language of 11 U.S.C. § 523(a)(8).

The Bankruptcy Reform Act of 1978 contained the first version of Section 523(a)(8). *See Essangui v. SLF V-2015 Tr. (In re Essangui)*, 573 B.R. 614, 617-20 (Bankr. D. Md. 2017) (reviewing the history of § 523(a)(8) and subsequent amendments). One of the most significant amendments to Section 523(a)(8) was in 2005, with the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). *Id.* at 619. The 2005 amendments separated the existing language into two subsections, Sections 523(a)(8)(A)(i) and (ii), and added a completely new section, Section 523(a)(8)(B). *Id.* at 619-20 (noting that "[t]he version of section 523(a)(8) resulting from BAPCPA is the version in effect

today"). The statute creates several categories of student loans that are not discharged in bankruptcy, as follows:

> (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—
>
> (A)
>
> (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
>
> (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
>
> (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986 [26 USCS § 221(d)(1)], incurred by a debtor who is an individual;

11 U.S.C.S. § 523(a)(8).

In this case, 11 U.S.C. § 523(a)(8)(A)(i) and (ii) do not apply. Those subsections, respectively, address: (1) government-backed or nonprofit-funded educational benefit overpayments or student loans; and (2) "funds received as an educational benefit, scholarship, or stipend," which are typically private education loans or scholarships. *See Golden v. JP Morgan Chase Bank (In re Golden)*, 596 B.R. 239, 257 (Bankr. E.D.N.Y. 2019).

The only subsection at issue in this case is 11 U.S.C. § 523(a)(8)(B). That subsection, quoted above, incorporates § 221(d) of the IRS Code. Section 221(d) of the IRS Code states:

> (d) Definitions. For purposes of this section—
>
> (1) Qualified education loan. The term 'qualified education loan' means any indebtedness incurred by the

> taxpayer solely to pay qualified higher education expenses—
> . . .
> (C) which are attributable to education furnished during a period during which the recipient was an eligible student. *Such term includes indebtedness used to refinance indebtedness which qualifies as a qualified education loan.* The term 'qualified education loan' shall not include any indebtedness owed to a person who is related … to the taxpayer …

26 U.S.C. § 221(d) (emphasis added).

### B. Interpretation of the Plain Language and Common, Ordinary Meaning of "Refinance."

The canons of statutory interpretation require courts to examine a statute's plain meaning. "When interpreting any statute, we must first and foremost strive to implement congressional intent by examining the plain language of the statute." *United States v. Passaro*, 577 F.3d 207 (4th Cir. 2009) (citing *Barnhart v. Sigmon Coal Co*., 534 U.S. 438, 450, 122 S. Ct. 941, 151 L. Ed. 2d 908 (2002)). "In interpreting the plain language of a statute, we give the terms their 'ordinary, contemporary, common meaning, absent an indication Congress intended [it] to bear some different import.'" *Stephens v. Astrue*, 565 F.3d 131, 137 (4th Cir. 2009) (citing *North Carolina ex rel. Cooper v. Tenn. Valley Auth*., 515 F.3d 344, 351 (4th Cir. 2008) (internal quotation marks omitted)). "We are guided here by a fundamental principle of statutory interpretation, which directs that we 'presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.'" *Tankersley v. Almand*, 837 F.3d 390,

395 (4th Cir. 2016) (where Congress did not define "applicant" the Fourth Circuit gave the word its ordinary meaning) (internal citations omitted).

The fundamental inquiry in this case is whether the loan to Ms. Conklin from the Jubers is a refinance of indebtedness which qualifies as a qualified education loan and therefore nondischargeable in Ms. Conklin's Chapter 13 bankruptcy. The terms which must be defined are "refinance" and "indebtedness."

The common, ordinary meaning of "refinance" as defined by several general-purpose dictionaries is as follows. The American Heritage Dictionary of the English Language (5th Ed. 2019) defines refinance as: "[*v.tr.*] [t]o renegotiate or replace the financing of (a debt or asset), usually to obtain a lower interest rate; [*v.intr.*] [t]o finance a debt or asset under new terms."[3] Merriam-Webster defines the term as "to renew or reorganize the financing of something: to provide for (an outstanding indebtedness) by making or obtaining another loan or a larger loan on fresh terms."[4] Black's Law Dictionary defines "refinancing" as "[*n*] An exchange of old debt for a new debt, as by negotiating a different interest rate or term or by repaying the existing loan with money acquired from a new loan." Black's Law Dictionary (11th ed. 2019); App. p 1.

Applying these definitions to the facts of this case results in the conclusion that the Jubers' payment of Ms. Conklin's three private student loans and her agreement to repay the Jubers is a "refinance." The transaction between the Jubers and Ms. Conklin was an "exchange of old debt for new debt," in the language of

---

[3] https://www.ahdictionary.com/word/search.html?q=refinance
[4] https://www.merriam-webster.com/dictionary/refinance

Black's Law Dictionary; a "finance [of] a [debt] under new terms," as defined by the American Heritage Dictionary; and a renewal or reorganization of the prior loans by making a new loan on fresh terms, to paraphrase Merriam-Webster's definition.

A precise reading of the statute shows that the actual statutory language defines a qualified education loan as "indebtedness used to refinance indebtedness which qualifies as a qualified education loan." 26 U.S.C. § 221(d)(1). The same general-purpose dictionaries define "indebtedness" as "[n] 1. [t]he state of being indebted; 2. [s]omething owed to another"[5] and "1. the condition of being indebted; 2. something (such as an amount of money) that is owed."[6] Black's Law Dictionary defines "indebtedness" as "1. The quality, state, or condition of owing money. 2. Something owed; a debt." Black's Law Dictionary (11th ed. 2019); App. p 2. In common parlance, a "refinance" is shorthand for the debt created when debts are renegotiated, renewed, or reorganized. When considering either the commonly-used term "refinance," or the actual phrase contained in the statute, "indebtedness used to refinance indebtedness which qualifies as a qualified education loan," the Jubers' payment of Ms. Conklin's three private loans and her agreement to repay the loan to the Jubers falls within the common, ordinary meaning of these words.

The statute expressly excludes "any indebtedness to a person who is related," as defined in 26 U.S.C. §§ 267(b) or 707(b)(1). *See* 26 U.S.C. § 221(d)(1). Under the applicable portions of 26 U.S.C. §§ 267(b) and 707(b)(1), related persons are members of a family, limited to siblings (whether whole or half blood), a spouse,

---

[5] https://ahdictionary.com/word/search.html?q=indebtedness
[6] https://www.merriam-webster.com/dictionary/indebtedness

ancestors, and lineal descendants. The Jubers and Ms. Conklin are not related under this definition. (RB 14 p 9). The exception for related parties is not superfluous. "[W]hen reading or interpreting a statute, a court must strive to give effect to every word contained within the statute." *Kofa v. United States INS*, 60 F.3d 1084, 1094 (4th Cir. 1995) (citing *United States v. Menasche*, 348 U.S. 528, 538-39, 99 L. Ed. 615, 75 S. Ct. 513 (1955)).

The exception Congress created for related parties indicates that Congress meant to include individual persons, such as the Jubers, not only banks or financial institutions, within the reach of § 221(d)(1). The "related parties" exception would be superfluous if Congress meant to include only institutional lenders in refinances of qualified education loans under § 221(d)(1). Congress did not expressly exclude individuals. It excluded only related parties as specifically defined in 26 U.S.C. §§ 267(b) and 707(b)(1).

The bankruptcy court reasoned that the plain language of the statute did not encompass the loan in the present case because the Jubers' loan to Ms. Conklin was not an "educational loan." The bankruptcy court relied on prefatory language in § 523(a)(8)(B) that introduces the third category of loans excepted from discharge in § 523(a) : "*any other educational loan* that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986 [26 USCS § 221(d)(1)]. . ." (emphasis added). The bankruptcy court's interpretation would require a loan to meet a definition of "education loan" before the court reaches the rest of the phrase in § 523(a)(8)(B). The bankruptcy court's reasoning was misguided. "Education

loan" is not defined in the statute. All the subsections involve "education loans" to some degree, because the entirety of Section 523(a)(8) deals with student loans. The language relied upon by the bankruptcy court—"education loan"—is only prefatory language. It introduces the substantive definition, which controls. The bankruptcy court ignored the substantive definition in § 523(a)(8)(B); its analysis never reached the plain meaning of the terms "indebtedness" or "refinance." The bankruptcy court's analysis missed the mark in this case.

### C. The Fourth Circuit's Recent *En Banc* Decision in *In re Hurlburt* Supports the Jubers' Position.

The Fourth Circuit's recent *en banc* review of a bankruptcy court and district court's ruling in a Chapter 13 proceeding is instructive in this case and required a similar analysis of statutory language. *See Hurlburt v. Black (In re Hurlbert)*, 925 F.3d 154, 2019 U.S. App. LEXIS 15551 (4th Cir. May 24, 2019).

Hurlburt, the debtor, purchased real property in Leland, North Carolina from the seller, Black, for $136,000. *In re Hurlburt*, 925 F.3d at 157. He paid $5,000 in cash at closing and financed the remaining $131,000 of the purchase price through a promissory note executed in Black's favor. *Id.* The note was secured by a purchase-money deed of trust naming Black as the beneficiary. *Id.* Hurlburt defaulted on the loan, and Black initiated a foreclosure action. *Id.* Three months later, Hurlburt filed a Chapter 13 bankruptcy proceeding, which stayed the foreclosure. *Id.* In his bankruptcy petition, Hurlburt valued the real property securing the mortgage at $40,000. *Id.*

Hurlburt brought an adversary proceeding in conjunction with his Chapter 13 proceeding seeking to quiet title to the property. *Id*. Black initially filed a proof of claim totaling $131,000, including a $40,000 secured claim and a $91,000 unsecured claim. *Id*. Black amended his proof of claim for a total claim of $180,971.72, declining to identify any portion of the claim as secured or unsecured. *Id*.

At issue was whether Hurlburt could bifurcate Black's claim into secured and unsecured components and "cram down" the unsecured components. Long-standing precedent in the Fourth Circuit had held that bifurcation into secured and unsecured components was not permitted in the narrow category of undersecured home mortgage loans. *See In re Hurlburt*, 925 F.3d at 156 (citing *Witt v. United Cos. Lending Corp. (In re Witt)*, 113 F.3d 508 (4th Cir. 1997)). Following the controlling precedent in *Witt*, the bankruptcy court held that Hurlburt's plan violated 11 U.S.C. § 1322, because a debtor was barred from modifying claims secured by a security interest on the debtor's principal residence into secured and unsecured components. *See Hurlburt v. Black (In re Hurlburt)*, 572 B.R. 160 (Bankr. E.D.N.C. 2017). The district court affirmed the bankruptcy court's judgment, and the Fourth Circuit affirmed the district court's ruling in an unpublished, per curiam opinion. *Hurlburt*, 925 F.3d at 158. The Fourth Circuit granted Hurlburt's request for a rehearing *en banc*, vacating the panel opinion. *Id*.

On rehearing, the Fourth Circuit considered the issue primarily one of statutory interpretation. *Id*. The court's analysis of 11 U.S.C. § 1322(c)(2) hinged on

three considerations: (1) the most natural reading of the statutory language; (2) the effect of prefatory language; and (3) the statute's cross-reference to another provision of the bankruptcy code. *Id*. at 162-164. The Fourth Circuit found the third consideration to be the most significant. *Id*. at 163-164. As to the third consideration, Section 1322(c)(2) stated that a Chapter 13 plan "may provide for the payment of the claim as modified *pursuant to section 1325(a)(5) of this title*." *Id*. at 163 (citing 11 U.S.C. § 1322(c)(2)). Noting that Section 1325(a)(5)(B)—known as the "cramdown provision"—set forth *substantive criteria* that a debtor's plan must satisfy, the court concluded that the cross-reference provided evidence of Congress's intent to authorize the modification of claims, not only payments, through bifurcation and cramdown. *Id*. at 163-64. At least one court has similarly given effect to the linkage of Section 523(a)(8)(B) to Section 221(d) of the Internal Revenue Code. *See Wiley v. Wells Fargo Bank, N.A. (In re Wiley)*, 579 B.R. 1, 11 (Bankr. D. Me. 2017).

The present case is similar to *In re Hurlburt* because the statutory section at issue, 11 U.S.C. § 523(a)(8)(B), contains both prefatory language and a cross-reference to another statutory provision. In the present case, the prefatory language is the term "education loan" in the statute: "any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986 [26 USCS § 221(d)(1)]." The word "education" is an adjective, which describes the word "loan." All loans governed by 11 U.S.C. § 523(a)(8) have *some* connection to education. The adjective "education" before the word "loan" in

the prefatory language, "education loan," places the applicable provision, 11 U.S.C. § 523(a)(8)(B), in the context of the statute, which applies generally to student loans. It is not meant to be a definition. It is the cross-referenced section—Section 221(d)(1) of the IRS Code—that provides the definition of the third category of loans excepted from discharge. It is the cross-reference that is the most substantive portion of the phrase. *Compare In re Hurlburt*, 925 F.3d at 163 (noting that "Section 1325(a)(5)(B) sets forth the *substantive* criteria a debtor's proposed plan must satisfy in order to be confirmed").

The Fourth Circuit emphasized the established principles of statutory interpretation in *Hurlburt*. It is not proper to rely on legislative history "to muddy [the] clear statutory language" when a statute's language is plain. *In re Hurlburt*, 925 F.3d at 164 (citing *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011)). Only when a court concludes that the terms of a statutory provision are ambiguous may it rely on the statute's legislative history. *Id*. (citing *United States v. Hatcher*, 560 F.3d 222, 226 (4th Cir. 2009)).

Furthermore, "[e]ven if Congress did not foresee all of the applications of [a] statute, that is no reason not to give the statutory text a fair reading." *In re Hurlburt*, 925 F.3d at 164 (citing *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1143 (2018)) (noting that silence in the legislative history cannot defeat the better reading of the text and statutory context)). Although Congress may not have foreseen the exact scenario in which the Jubers' loan to Ms. Conklin arose, a court may not sidestep the statutory language.

Policy concerns do not override the statute's plain language. The bankruptcy court relies upon Congress' intent in making funds available to students under initial loans. (RB 59 p 23) (noting that Congress' enactment of Section 523(a)(8) was to protect the solvency of educational loan programs). The bankruptcy court concludes the Jubers' extension of credit here is not excepted from discharge because it was not to "fund an education." (RB 59 p 19). This overlooks, however, that there is a secondary market for refinances of student loans. It is Congress that must determine whether refinances—and what type of refinances—are excepted from discharge. Under the current statutory definition, the indebtedness Ms. Conklin incurred to refinance her three private student loans is included in the exception from discharge because it meets the common, ordinary definition of refinance. If Congress intends to exclude refinances like the Jubers' loan to Ms. Conklin, Congress is solely responsible for enacting legislation to revise the statute. *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 52 (2008) (noting that "it is incumbent upon the Legislature, and not the Judiciary, to determine whether [a statute] is in need of revision"); *Hurlburt*, 925 F.3d at 166 n.5.

## II. Courts Have Held That Similar Loans Are Qualified Education Loans Under 11 U.S.C. § 523(a)(8)(B).

The bankruptcy court ignored several decisions interpreting § 523(a)(8)(B) in cases with similar facts and misconstrued the holdings of the few cases it cited. While there are only a handful of cases applying § 523(a)(8)(B), those cases should be considered. When there is no decision of precedential value within the district court or the Fourth Circuit, it is appropriate to turn to decisions of other courts as

persuasive precedent. See *Morrison v. Astrue*, No. 3:09cv536, 2011 U.S. Dist. LEXIS 36666, at *7 (W.D.N.C. Mar. 31, 2011) (holding district court's consideration of decisions of other circuits proper where there was no decision of precedential value within the Fourth Circuit).

The case *Miller v Gomez*, No. 17-61024, 2017 Bankr. LEXIS 4078 (Bankr. D. Or. Nov. 29, 2017) is directly on point, and the United States Bankruptcy Court for the District of Oregon applied the reasoning that should be applied in this case. In *Miller*, the debtor borrowed approximately $41,000 from Sallie Mae Educational Trust to pay educational expenses he incurred while attending Pepperdine University. 2017 Bankr. LEXIS 4078, at *2. The creditor, Miller, was co-obligor on the Sallie Mae loan. *Id*. When the debtor defaulted, Miller paid the entire balance due of $71,639.62. *Id*. The evidence showed that at the time Miller paid the Sallie Mae loan, the debtor agreed to repay Miller the amount disbursed to Sallie Mae. *Id*. The evidence further showed that although the agreement to repay was an oral agreement, Miller paid off the Sallie Mae loan in anticipation of the debtor signing a promissory note memorializing his agreement to repay. *Id*. The agreement to repay was in fact later memorialized in a promissory note signed by the debtor, which stated that the debtor's obligation arose from the "refinancing [of] a qualified education loan as defined in 26 U.S.C. § 221(d)(1)." *Id*. The bankruptcy court first held that the original Sallie Mae loan was a qualified education loan under § 523(a)(8)(B) and § 221(d)(1) of the Internal Revenue Code. *Id.* at *4. The court then focused on the language in § 221(d)(1) stating that a qualified education loan

"includes indebtedness used to refinance indebtedness which qualified as a qualified education loan." *Id*. at *4-5. Finding those statutory terms to be undefined, the court looked to the common, ordinary meaning of "refinance." *Id.* Citing Black's Law Dictionary, the court noted that the generally accepted meaning of "refinance" is "an exchange of old debt for a new debt, as by negotiating a different interest rate or term or repaying the existing loan with money acquired from a new loan." *Id.* at *5 (citing Black's Law Dictionary (10th ed.)).

The only distinctions between *Miller* and the present case are: (1) the Jubers were not co-signors on Ms. Conklin's three original, private student loans; and (2) the promissory note signed by Ms. Conklin in favor of the Jubers did not include language referencing 26 U.S.C. § 221(d)(1). Neither distinction results in a different outcome here.[7] Whether the Jubers co-signed the three private loans is not relevant to the analysis. As to the second distinction, there is no statutory requirement that the loan instrument reference the statute, 11 U.S.C. § 523(a)(2)(B), or § 221(d)(1). As in *Miller*, the Jubers' payment of the balance due on Ms. Conklin's three private loans and her agreement to repay the debt, which was memorialized in the written

---

[7]The bankruptcy court discusses *Miller v Gomez*, No. 17-61024, 2017 Bankr. LEXIS 4078 (Bankr. D. Or. Nov. 29, 2017) at pages 28-29 of its Order. (RB 59 pp 28-29). The bankruptcy court places emphasis on the fact that, in *Miller*, the guarantor paid off the loan. That fact, however, was not the basis of the court's holding in *Miller*, as discussed, *supra*. In footnote 2, the bankruptcy court cites additional cases as further authority for the principle that a debt is nondischargeable when a guarantor—or "accommodation party"—pays off the loan. (RB p 28 n2) (citing *Benson v. Corbin (In re Corbin)*, 506 B.R. 287, 296 (Bankr. W.D. Wash. 2014); *Brown v. Rust (In re Rust)*, 510 B.R. 562, 567 (Bankr. E.D. Ky. 2014); and *De La Rosa v. Kelly (In re Kelly)*, 582 B.R. 905, 907 (Bankr. S.D. Tex. 2018)). Each of those cases was decided under Section 523(a)(8)(A)(ii) and is not analogous to the present case.

promissory note, is a "refinance" or "refinancing indebtedness" as those terms are commonly understood and defined in Black's Law Dictionary. Thus, the Jubers' loan to Ms. Conklin is a qualified education loan under § 523(a)(8)(B) and § 221(d)(1) of the Internal Revenue Code.

Another case with similar facts is *Manion v. Modeen (In re Modeen)*, No. 17-119547-7, 17-71, 586 B.R. 298, 2018 Bankr. LEXIS 1701 (Bankr. W.D. Wis. June 8, 2018). In *Modeen*, the debtor intended to file bankruptcy and spoke with her boss before filing, fearing negative consequences to her employment. 586 B.R. at 301. Her boss offered to make loans to her to refinance her student loans and other debts. *Id*. The parties signed a loan refinancing the prior educational loans. *Id.* When the debtor ultimately filed bankruptcy, her boss filed an adversary proceeding seeking a ruling that the education loan refinances were nondischargeable under § 523(a)(8)(B) as a refinance of qualified education loans. *Id*. The bankruptcy court stated that "[i]ndividual debtors generally receive no discharge for 'any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986.'" *Id*. at 302 (citing 11 U.S.C. § 523(a)(8)(B)). The court excepted the debt from discharge and then conducted an undue hardship analysis, which is not relevant here, as Ms. Conklin has not claimed undue hardship.

In *Ramani v. Romo (In re Romo)*, No. 17-21440, No. 17-2107, 2018 Bankr. LEXIS 1448 (Bankr. E.D. Mich. May 14, 2018), the debtor incurred significant student loan debt to obtain a bachelor's and master's degree. 2018 Bankr. LEXIS

1448, at *2. The United States Department of Education offered debt forgiveness if she paid $105,000. *Id.* Because she did not have that amount of money, the debtor's in-laws paid the debt for her. *Id.* The only documentation of the loan was a handwritten note on a receipt. *Id.* The daughter-in-law divorced the son and stopped making the $400.00 bi-weekly payments. *Id.* The in-laws sued the debtor in state court and obtained a state court judgment when the debtor failed to answer the complaint. *Id.* at *2-3. When the debtor sought relief under Chapter 7, the in-laws filed an adversary proceeding seeking a determination of the dischargeability of the debt. *Id.* at *4. The bankruptcy court applied collateral estoppel to uphold the state court judgment, finding that the state court complaint alleged all the necessary facts to support the judgment and all elements of 11 U.S.C. § 523(a)(8) and 26 U.S.C. 221(d)(1). *Id.* at *8. Reviewing the state court judgment, the bankruptcy court concluded that the debtor incurred the loan to pay her educational expenses, which met 26 U.S.C. § 221(d)(1)(A)-(C). *Id.* at *8-9. Pertinent to the analysis in this case, the court further concluded that "[t]he term indebtedness specifically includes refinancing and the Plaintiffs are not 'related' as defined by either 26 U.S.C. § 267(b) or § 707(b)(1) as an exclusion from application of 26 U.S.C. § 221(d)(1)." *Id.* at *9.

The bankruptcy court's decision in *Salgado v. Pastor (In re Pastor)*, No. 16-23969, 17-01067, 2018 Bankr. LEXIS 1973 (Bankr. S.D. Fla. June 28, 2018) also considered the application of 11 U.S.C. § 523(a)(8)(B) and 26 U.S.C. § 221(d)(1). The *Pastor* case raised the question whether the debtor's attendance at a veterinary

school in the Cayman Islands met the requirement that a student was an "eligible student" under § 221(d)(1)(C). 2018 Bankr. LEXIS at *5-6. While the *Pastor* case did not involve a "refinance," the case demonstrates the proper analysis. The court considered the plain meaning of the statute's terms and not whether the uncommon facts of a student attending an off-shore veterinary school or the policy underlying the statute supported finding the debt dischargeable.

The bankruptcy court discusses the decision in *Doyle v. Creeger (In re Creeger)*, Nos. 14-34053, 15-3023, 2016 Bankr. LEXIS 2076 (Bankr. N.D. Ohio May 20, 2016) and notes that the facts are somewhat similar. (RB 59 pp 24-28). In *Creeger*, the plaintiff made tuition payments to the University of Toledo on behalf of the debtor, who allegedly was a noncitizen studying there on a student visa. *Creeger*, 2016 Bankr. LEXIS 2076, at *3-4. The oral loan for tuition payments was later converted to a promissory note, and the plaintiff obtained a state court judgment upon the debtor's default. *Id*. at *4. The bankruptcy court oversimplifies the opinion and holding in *Creeger*, which confuses the importance of the ruling. First, the *Creeger* case was at the summary judgment stage, so the bankruptcy court made no final ruling as to dischargeability. *See id*. at *38. While the *Creeger* court considered the "prefatory language" as to whether the tuition payment was an "education loan," the court's focus was on whether the extension of credit was a "loan," not whether it was educational in nature. *Id*. at *19-21. Furthermore, a different portion of 26 U.S.C. § 221(d)(1) was in dispute in *Creeger*—language stating the that indebtedness must be incurred on behalf of a "taxpayer"—in

Section 221(d)(1)(A). *Id*. at *26-32. The *Creeger* court expressly acknowledged that "'indebtedness used to refinance indebtedness which qualifies as a qualified education loan' *remains nondischargeable under the statute*…" *Creeger*, 2016 Bankr. LEXIS 2076, at *10 (emphasis added). Thus, the *Creeger* decision is distinguishable, but its statement in *dicta* supports the Jubers' position in this case.

At least one bankruptcy court has recognized and properly applied the exception to § 221(d)(1) for "related parties." *See Swenson v. Swenson*, No. 16-10016, 2016 Bankr. LEXIS 3117 (Bankr. W.D. Wis. Aug. 22, 2016). In *Swenson*, a father who used a home equity loan to refinance student loans he co-signed with his daughter could not rely upon § 523(a)(8)(B) to except the refinance from discharge, because he and his daughter were related. *Id*. at *7. The *Swenson* facts are distinguishable from the present case. It is undisputed that the Jubers are not related to Ms. Conklin. (RB 14 p 9). The very limited exception for related parties does not apply here.

## III. The Bankruptcy Court Imposed a Set of Criteria and Tests That Are Not Supported by the Plain Language of the Statute.

Under the guise of statutory interpretation, the bankruptcy court made a results-oriented decision that hinged on the bankruptcy court's ultimate view of the facts. The bankruptcy court concluded that the Jubers were motivated to help their son, not the Debtor, and thus the oral loan and subsequent promissory note were dischargeable in Ms. Conklin's Chapter 13 proceeding. (RB 59, p 37).

The bankruptcy court acknowledges that the facts played a key role in its decision, noting that "the landscape in which this dispute arose and the factual

nature of the loan at issue are crucial to this court's ultimate decision." (RB 59, p 2).

In reaching a decision driven by the facts, the bankruptcy court—while claiming to be interpreting the "plain language" of the statute—imposed a set of criteria and tests that are not part of the statutory language. The criteria considered by the bankruptcy court included: the Jubers' motive in making the loan; who sought the loan or offered the extension of credit; the payment history on the original loan; whether the individual offering the loan was an institutional lender; and whether the loan instrument stated it dealt with money used to fund an education. None of these factors are contained in the statute.

The bankruptcy court attributed an "ulterior motive" to the Jubers—a desire to help their son. "[T]he Jubers [had] an ulterior motive for using the HELOC to pay off the Three Original Loans: a love for their son and a desire to financially support his impending marriage." (RB 59, p 36).

The bankruptcy court also emphasized that the Jubers offered to refinance Ms. Conklin's private loans to help the couple, not vice versa, stating, "the Debtor did not seek out the Jubers' [sic] in hopes of consolidating her debt." (RB 59 p 34).

The bankruptcy court was persuaded by the fact that Ms. Conklin did not have difficulty making her payments under the original loans, noting that "the Debtor was not struggling to make her payments on the Three Original Loans when the Jubers approached her about the Oral Loan." (RB 59 p 34).

The bankruptcy court also considered whether the loan was made by an institutional lender. "The Jubers are not the type of lenders that Congress intended to protect when they considered the backbone of the student lending infrastructure nationwide." (RB 59 p 24). The bankruptcy court noted that "the Oral Loan and Promissory Note made no mention of the Debtor's student status or the fact that it dealt with funds used towards an education." (RB 59 p 21).

None of these factors are contained in the statute, however. The statute hinges on the substantive definition contained in Section 221(d)(1) and incorporated by reference into § 523(a)(8)(B). What motived the creditor to make the loan, whether the debtor had made timely payments under the original loan, whether the credit was extended by an institutional lender, and the other factors considered by the bankruptcy court are not part of the "plain meaning" of the statute. In fact, these factors are completely extraneous to the statute—and therefore should have no bearing in the analysis.

In addition to what it viewed as compelling, uncommon facts, the bankruptcy court's reasoning hinged on policy considerations. These policy considerations included: (1) Congress's desire to make funds available for students who want to pursue an education, including those who could not qualify under traditional underwriting standards; and (2) protecting lenders from students discharging large sums upon completion of their education. (RB 59 pp 22-27). The policy identified by the bankruptcy court is the desire to protect the solvency of education loan programs. (RB 59 p 23). In support of its decision, the bankruptcy court stated,

["[t]he Jubers are not part of any student loan program, the financial integrity of which Congress sought to protect by the passage of § 523(a)(8)." (RB 59 pp 27-28). The bankruptcy court also stated, "[t]he Jubers ask the court to ignore the fact that they are not a bank, a governmental institution, or some other organization regularly engaged in the extension of credit to students." (RB 59 p 24).

The bankruptcy court concluded that the policies underlying the statute did not support a ruling in the Jubers' favor. In essence, the bankruptcy court concluded the policy underlying 11 U.S.C. § 523(a)(8)(B) did not sweep broadly enough to include the facts at issue: "[t]he Jubers are not the type of lenders that Congress intended to protect when they considered the backbone of the student lending infrastructure nationwide." (RB 59 p 24). Policy concerns are not paramount, however. "Resolution of the pros and cons of whether a statute should sweep broadly or narrowly is for Congress." *United States v. Rodgers*, 466 U.S. 475, 484 (1984).

The bankruptcy court was also persuaded by the fact that the Jubers did not file IRS Form 1098-E. (RB 59 p 35). IRS Form 1098-E documents the interest on student loans, which the debtor may deduct from her taxes each year. Compliance with tax filing requirements, however, is a matter of IRS enforcement and penalties. There are numerous situations where litigants have not complied with various laws or regulations when their case reaches litigation. Whether the parties understood and complied with legal requirements and regulations does not determine whether the debt instrument falls within the definition in § 523(a)(8)(B).

If courts' decisions were driven by how litigants understood and treated their business deals and financial agreements before they reached the courthouse door—instead of how the governing law applies to those arrangements—the law would lose all predictability and uniformity.

At the outset of its Order, the bankruptcy court acknowledges that the funds that Kevin and Linda Juber loaned Ms. Conklin were "to enable her to pay off her private student loans." (RB p 2). Yet, the remainder of the court's opinion reasons that the loan did not have an educational purpose for all sorts of reasons. The simple statement that the loan was made "to enable [Ms. Conklin] to pay off her private student loans" meets the common, ordinary definition of the term "refinance."

## IV.  The Cases Relied Upon by the Bankruptcy Court Are Distinguishable.

The bankruptcy court relied primarily upon *Golden v JP Morgan Chase Bank (In re Golden)*, 596 B.R. 239 (Bankr. E.D.N.Y. 2019) and *In re Oliver*, 499 B.R. 617 (Bankr. S.D. Ind. 2013) in support of its decision, both of which are distinguishable. (RB 59 pp 13-17).

*In re Golden* is largely about 11 U.S.C. § 523(a)(8)(A)(ii), not § 523(a)(8)(B). *Golden*, 596 B.R. at 260-65. Also at issue in *Golden* was whether the loans exceeded the published cost of attendance and, as such, did not come within the dischargeability provisions of § 523(a)(8)(B). *Id*. at 267-69. The facts did not involve a refinance and the question of the meaning of *refinance* or *indebtedness* as defined in 26 U.S.C. § 221(d)(1) was not before the court. *See id*. The definition of a

"qualified education loan," however, as a debt incurred by an eligible student, at an eligible institution, for eligible expenses, was before the court. *Id*. at 268. Discussing the process of statutory interpretation, the *Golden* court emphasized the importance of definitions. "Where statutes — including, as here, the Bankruptcy Code and the Internal Revenue Code — provide definition, those definitions should be the starting point, and likely the concluding point, for the analysis." *Id*. at 269. In this case, a qualified education loan "includes indebtedness used to refinance indebtedness which qualifies as a qualified education loan." 26 U.S.C. § 221(d)(1). This substantive definition is the concluding point for the analysis, as the *Golden* court reasoned with respect to a different portion of 11 U.S.C. § 523(a)(8)(b).

*In re Oliver* involved a debtor's failure to pay tuition and fees owed to a university. *Oliver*, 499 B.R. at 620. The focus of the court's analysis in *In re Oliver* was whether the debt was dischargeable under § 523(a)(8)(B) because the debtor had not received funds from the university, and, therefore, the debt was not a loan. *Id*. at 624-25. The bankruptcy court in this case hinges its analysis on the prefatory language "any other educational loan," as the court did in *Oliver*. *Id.* at 622-23. The focus of the court's inquiry in *Oliver*, however, was on whether the transaction at issue (unpaid tuition and fees) was a *loan*, not the *educational* nature of the transaction. *See id*. As in *In re Hurlburt*, in this case there is *both* prefatory language and a cross-reference to another statutory provision. *Hurlburt*, 925 F.3d at 163-64. As in *Hurlburt*, the cross-reference to § 221(d)(1) is the most significant consideration because it provides the substantive definition. *Id*. at 163. While

courts must give effect to all words in a statute, the word "educational" has already been given effect in this case, because the underlying loans were held to be "qualified education loans" by the bankruptcy court's grant of partial summary judgment. *Compare Oliver*, 499 B.R. at 623.

The bankruptcy court also relied upon *Homaidan v. SLM Corp. (In re Homaidan)*, 596 B.R. 86, 102 (Bankr. E.D.N.Y. 2019) to support its conclusion that the Jubers' loan to Ms. Conklin was not "educational in nature." (RB 59 pp 19-21). The bankruptcy court acknowledges that *Homaidan* involved a loan falling under § 523(a)(8)(A)(ii). (RB 59 p 20). In *Homaidan*, the debtor filed an adversary proceeding seeking a declaratory judgment that $12,567 in "direct to consumer" loans made by four lenders "were made outside the financial aid office and were not made for qualified education expenses." *Homaidan*, 596 B.R. at 92. Homaidan's complaint alleged that the loans were not "qualified education loans" under § 523(a)(8)(B), but the defendants filed a motion to dismiss the complaint, focusing instead on § 523(a)(8)(A)(ii). *Id*. at 99-100. The bankruptcy court's decision was limited, holding that Homaidan had sufficiently alleged that the loans were not "an obligation to repay funds received as an educational benefit, scholarship, or stipend" under § 523(a)(8)(A)(ii), and thus, his complaint survived the lenders' motion to dismiss. *Id*. at 109-10. In its analysis, the *Homaidan* court emphasized that the category of "qualified education loans" addressed in § 523(a)(8)(B) is distinct from the category of "funds received as an educational benefit, scholarship, or stipend," addressed in § 523(a)(8)(A)(ii). *Id*. at 102, 106 (reasoning that to treat the separate

subsections as coequal would render superfluous the other provisions of § 523(a)); *see also Kashikar v. Turnstile Capital Mgmt., LLC (In re Kashikar)*, 567 B.R. 160, 167 (B.A.P. 9th Cir. 2017) (noting that in organizing the provisions of § 523(a)(8) Congress intended each subsection to be distinct and to target different kinds of debts). Therefore, it is a fallacy to equate the analysis applied in cases involving § 523(a)(8)(A)(ii) with the analysis applied in cases arising under § 523(a)(8)(B).

The bankruptcy court also discusses at length *In re Nies*, 334 B.R. 495, 501, 2005 Bankr. LEXIS 2407, at *16-18 (Bankr. D. Mass. 2005). (RB 59, pp 29-34). *In re Nies* involved § 523(a)(8)(A), not § 523(a)(8)(B), as discussed more fully in Section V, *infra*.

None of these cases relied upon by the bankruptcy court discusses the term "refinance" or examines the statutory language of the cross-reference, 26 U.S.C. § 221(d) , contained in Section 523(a)(8)(B).

## V. The "Substance of the Transaction" Test Does Not Apply.

The bankruptcy court proposes a novel approach, suggesting that bankruptcy courts should adopt the "substance of the transaction" test, which is applied to cases arising under § 523(a)(8)(A), to the present case and other cases arising under § 523(a)(8)(B). This completely new approach to the analysis of loans arising under § 523(a)(8)(B) is neither supported by the statute's language nor by the inherent inquiry here.

In interpreting 11 U.S.C. § 523(a)(8)(A), a majority of courts apply a test that determines the educational nature of a loan by focusing on the substance of the

transaction which resulted in the obligation. *In re Nies*, 334 B.R. at 501, 2005 Bankr. LEXIS 2407, at *16-18 (Bankr. D. Mass. 2005. The First Circuit Bankruptcy Appellate Panel has expressed the "substance of the transaction" test as follows: "whether the creditor extended credit to the Debtor (for educational purposes) and whether the Debtor promised to repay the amount of credit advanced." *DePasquale v. Bos. Univ. Sch. of Dentistry (In re DePasquale)*, 225 B.R. 830, 832 (B.A.P. 1st Cir. 1998) (quoting *Johnson v. Mo. Baptist Coll. (In re Johnson)*, 215 B.R. 750, 752 (Bankr. E.D. Mo. 1997), *aff'd Johnson v. Mo. Baptist Coll. (In re Johnson)*, 218 B.R. 449, 456-57 (B.A.P. 8th Cir. 1998) ).

    In discussing the substance of the transaction test, the bankruptcy court relies primarily upon *In re Nies*. (RB 59, pp 29-34). The bankruptcy court in *In re Nies* concluded the purpose of the loan was to entice the debtor, a radiologist, to go to Tift County, Georgia, to work at the hospital and serve an underserved rural area. *In re Nies* 334 B.R. at 505. Thus, the real "purpose" of the loan in *Nies* was to support the charitable and business mission of the hospital, not to fund the education of the debtor. *Id.* The bankruptcy court acknowledged that *In re Nies* involved § 523(a)(8)(A), not § 523(a)(8)(B), but found the substance of the transaction test "instructive in the absence of relevant case law." (RB 59 p 30).

    This Court should not adopt the "substance of the transaction" test in this case or in other cases controlled by §523(a)(8)(B) for this reason: the touchstone of the inquiry in this case is the common, ordinary meaning of "refinance." Furthermore—and most importantly—the Jubers' loan to Ms. Conklin *already has*

*the hallmark of an education loan* because the underlying loans were "qualified education loans." The bankruptcy court granted summary judgment on that issue. (RB 27).

There are myriad ways for individuals to pay off prior educational loans with new financing. The scenarios and circumstances creating a newly-financed loan may differ—but, so long as the underlying loan is a "qualified education loan" and the new loan meets the ordinary meaning of "refinance"—the new loan falls within § 523(a)(8)(B). The Jubers' loan to Ms. Conklin meets that test.

Furthermore, the context in which bankruptcy courts developed the "substance of the transaction" test is important. Debtors were making the argument that § 523(a)(8)(A) did not apply when no money changed hands. Examples of those situations include a grant of tuition credit, attendance without prepayment of tuition, or the extension of short-term credit. *See In re Nies*, 334 B.R. at 501 n.1. Debtors were seeking to discharge these debts by arguing that if no money had changed hands, the financial benefit was not a "loan." *See DePasquale*, 225 B.R. at 832-33 (collecting cases). Bankruptcy courts found this approach to be too formulaic and began to consider whether the funds at issue were for educational purposes, not strictly whether money changed hands. *See id*. at 832. The majority approach was to hold that a debt was an "education loan" for purposes of § 523(a)(8)(A) if an institution or agency provided "funds, credit, or financial accommodations to a debtor for educational purposes . . . whether or not funds, as such, were advanced." *Id*. at 833. Thus, the policy underlying the creation of the

"substance of the transaction" test was a policy that sought to prevent debtors from avoiding the nondischargeability provision of § 523(a)(8)(A). *See In re Nies*, 334 B.R. at 502. The bankruptcy court here suggests using the "substance of the transaction" test for the opposite purpose—to make it easier for Ms. Conklin to discharge a debt. While the reasoning of the substance of the transaction test does not apply here, it is worth noting that Ms. Conklin does not dispute that the transaction was a loan. (RB 14 p 30).

Interestingly, as the bankruptcy courts formulated the "substance of the transaction" test, they looked to the common, ordinary meaning of the word "loan." *See, e.g., Johnson v. Mo. Baptist Coll. (In re Johnson)*, 218 B.R. 449, 456-57 (B.A.P. 8th Cir. 1998) (noting that "[i]n the absence of a statutory ambiguity, courts are required to apply the plain meaning of the term at issue"). The *Johnson* court considered the definition of "loan" contained in Black's Law Dictionary and Webster's Third International Dictionary. *See id*. The Eight Circuit Bankruptcy Appellate Panel's approach of using the plain meaning of the term "loan" in developing the substance of the transaction test simply confirms the efficacy of this tool in statutory interpretation and its appropriateness in this case.

The *inherent inquiry* here is whether Ms. Conklin's debt to the Jubers is "indebtedness used to refinance" a qualified education loan. Imposing a more stringent test—a multi-factored test that considers whether the newly-refinanced loan was "educational"—would change the inquiry entirely. Therefore, this Court

should reject the bankruptcy court's suggested adoption of the "substance of the transaction" test in cases arising under 11 U.S.C. § 523(a)(8)(B).

## VI. The Jubers Are Entitled to an Award of Their Attorneys' Fees, Costs, and Expenses as Provided in the Promissory Note.

The Promissory Note between the Jubers and Ms. Conklin provides that, in the event of a default, "[t]he Borrower agrees to pay all costs and expenses that the Note Holders may incur by reason of any default, including without limitation, reasonable attorneys' fees with respect to legal services relating to any default. . ." (RB 60 p 53). Under this provision, if the Jubers prevail in this action, they are entitled to an award of their costs, expenses, and reasonable attorneys' fees incurred in the Chapter 13 and Adversary Proceeding.

## CONCLUSION

Relationships end. It would be an exercise in futility to attempt to determine why Ms. Conklin's and Christopher Juber's relationship ended or who was at fault. Beyond the question of why the relationship ended, other questions loom: why was the loan made, and what were the parties' motives? It is not the courts' role, however, to examine the motives of the parties in considering the question of law presented here. Rather, the question of law presented here is: is the Jubers' loan to Ms. Conklin a "qualified education loan" under the controlling statute? For the foregoing reasons, it is, and therefore is nondischargeable in Ms. Conklin's bankruptcy. In addition, the bankruptcy court's erroneous decision in the Adversary Complaint has the domino effect of allowing Ms. Conklin's Chapter 13 Plan to pay the U.S. Department of Education directly, unfairly discriminating

against the Jubers' claim. Therefore, the Jubers respectfully request that the bankruptcy court's ruling be reversed and that this Court hold that the Jubers' claim is an educational loan excepted from discharge under § 523(a)(8)(B) and further hold that the Jubers are entitled to an award for their reasonable attorneys' fees, costs, and expenses as provided in the parties' Promissory Note.

**CERTIFICATE OF COMPLIANCE**

In accordance with Federal Rule of Bankruptcy Procedure 8014(a)(10), the undersigned counsel certify that this document complies with the type-volume limitations of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B) in that it contains no more than 13,000 words. This document contains 10,512 words as indicated by the word processing system used to prepare the document.

This the 1st day of November, 2019.

/s/ Heather W. Culp
Heather W. Culp
NC State Bar No. 30386
Essex Richards, P.A.
1701 South Boulevard
Charlotte, North Carolina 28203
Telephone: (704) 377-4300
Facsimile: (704) 372-1357
Email: hculp@essexrichards.com

/s/ Bonnie Keith Green
Bonnie Keith Green
N.C. State Bar No. 36450
The Green Firm, PLLC
P.O. Box 11011
Charlotte, North Carolina 28220
Telephone: (704) 527-2899
Email: bonnie@bonniegreenlaw.com

**refer charges.** See PREFERRAL.

**referee.** (17c) 1. A master appointed by a court to assist with certain proceedings. • In some jurisdictions, referees take testimony before reporting to the court. See MASTER (2). 2. See *judicial officer* (3) under OFFICER. 3. Someone who judges an article or research idea before it is published or money is provided for it. 4. Someone who stays close to the action on a sporting ground to ensure that the rules of the sport are followed during play.

▸ **referee in bankruptcy.** (1898) A federal judicial officer who administers bankruptcy proceedings. • Abolished by the Bankruptcy Reform Act of 1978, these referees were replaced by bankruptcy judges. — Also termed *register in bankruptcy.* See *bankruptcy judge* under JUDGE.

**referee's deed.** See DEED.

**reference,** *n.* (16c) 1. The act of sending or directing to another for information, service, consideration, or decision; esp., the act of sending a case to a master or referee for information or decision.

▸ **general reference.** (18c) A court's reference of a case to a referee, usu. with all parties' consent, to decide all issues of fact and law. • The referee's decision stands as the judgment of the court.

▸ **special reference.** (1831) A court's reference of a case to a referee for decisions on specific questions of fact. • The special referee makes findings and reports them to the trial judge, who treats them as advisory only and not as binding decisions.

2. An order sending a case to a master or referee for information or decision. 3. Mention or citation of one document or source in another document or source. 4. *Patents.* Information — such as that contained in a publication, another patent, or another patent application — that a patent examiner considers to be anticipatory prior art or proof of unpredictability in the art that forms a basis for one or more of an applicant's claims to be rejected. See CITATION (4). 5. The act of consulting something for information <for future reference>. 6. An already known fact, idea, event, etc. that helps one understand or make a judgment about another situation <school experience as a frame of reference>. 7. A book, article, essay, etc. from which information has been obtained <a lengthy list of references>. — **refer,** *vb.*

**reference case.** See CASE (1).

**reference committee.** See *resolutions committee* under COMMITTEE (1).

**reference statute.** See STATUTE.

***referendarius*** (ref-ə-ren-dair-ee-əs), *n.* [Law Latin] (17c) 1. *Roman law.* An officer who received petitions to the emperor and who delivered answers to the petitioners. 2. See APOCRISARIUS.

***referendo singula singulis.*** See REDDENDO SINGULA SINGULIS.

**referendum.** (1847) 1. The process of referring a state legislative act, a state constitutional amendment, or an important public issue to the people for final approval by popular vote. 2. A vote taken by this method.

> "The referendum is a device of direct democracy by which the people are asked to vote directly on an issue or policy. It differs from an election, which is a vote to elect persons who will make decisions on *behalf of* the people, or a recall, by which citizens are given the opportunity to remove from office an elected representative. Although this distinction between issue voting and person voting is apparently clear, it may be questioned, such as when the referendum is, formally or de facto, a vote of confidence or about the accession or permanence in power of a person. This is often the case in authoritarian regimes, but also happens in democratic contexts (eg, the use of referendums by de Gaulle in France)." Laurence Morel, "Referendum," in *The Oxford Handbook of Comparative Constitutional Law* 501, 501 (Michel Rosenfeld & András Sajo eds., 2012) (citation omitted).

3. *Int'l law.* An ambassador's request for instructions on subject matter that the ambassador does not have sufficient power to address. Pl. referendums, referenda.

▸ **recall referendum.** See *recall election* under ELECTION.

**referential legislation.** See LEGISLATION (3).

**referral.** (1927) The act or an instance of sending or directing to another for information, service, consideration, or decision <referral of the client to an employment-law specialist> <referral of the question to the board of directors>.

**referral fee.** See FEE (1).

**referral sales contract.** (1966) A dual agreement consisting of an agreement by the consumer to purchase goods or services (usu. at an inflated price) and an agreement by the seller to compensate the consumer for each customer (or potential customer) referred to the seller. — Also termed *referral sales agreement.* Cf. PYRAMID SCHEME.

**refinancing,** *n.* (1902) An exchange of an old debt for a new debt, as by negotiating a different interest rate or term or by repaying the existing loan with money acquired from a new loan. — **refinance,** *vb.*

**reflation.** (1932) The purposeful increasing of the amount of money being used in a country as a stimulus to trade.

***reformatio in peius*** (ref-ər-may-shee-oh in pee-əs). [Latin] (1966) *Hist.* A change for the worse.

**reformation** (ref-ər-may-shən), *n.* (1829) An equitable remedy by which a court will modify a written agreement to reflect the actual intent of the parties, usu. to correct fraud or mutual mistake in the writing, such as an incomplete property description in a deed. • In cases of mutual mistake, the actual intended agreement must usu. be established by clear and convincing evidence. In cases of fraud, there must be clear evidence of what the agreement would have been but for the fraud. See RECTIFICATION. — **reform,** *vb.*

> "The standard explanation of reformation is that the parties had an actual agreement, and that the writing does not reflect that agreement. . . . If the parties made a mistake about the premises of their agreement — a mistake about some fact in the world outside their word-processing machines — reformation is not a solution. The court cannot reform the contract because it cannot know what the parties would have agreed to but for the mistake." Douglas Laycock, *Modern American Remedies* 613 (4th ed. 2010).

**reformation condition.** See *conditional bequest* under BEQUEST.

**reformative punishment.** See PUNISHMENT (1).

**reformatory,** *n.* (1834) A penal institution in which young offenders, esp. minors, are disciplined and trained or educated. — Also termed *reform school.*

wrongdoing <the defendant incriminated an accomplice>. — Also termed *criminate*. — **incriminatory,** *adj.*

**incriminating,** *adj.* (18c) Demonstrating or indicating involvement in criminal activity <incriminating evidence>.

**incriminating admission.** See ADMISSION (1).

**incriminating circumstance.** See CIRCUMSTANCE.

**incriminating evidence.** See EVIDENCE.

**incriminating statement.** See STATEMENT.

**incrimination.** (18c) **1.** The act of charging someone with a crime. **2.** The act of involving someone in a crime. — Also termed *crimination*. See SELF-INCRIMINATION.

**incroach,** *vb. Archaic.* See ENCROACH.

**incroachment.** *Archaic.* See ENCROACHMENT.

***in cujus rei testimonium*** (in kyoo-jəs **ree**-I tes-tə-**moh**-nee-əm). [Law Latin] (16c) In witness whereof. • These words were used to conclude deeds. The modern phrasing of the testimonium clause in deeds and other instruments — beginning with *in witness whereof* — is a loan translation of the Latin.

***inculpatae tutelae moderatio.*** See MODERAMEN INCULPATAE TUTELAE.

**inculpate** (in-**kəl**-payt *or* **in**-kəl-payt), *vb.* (18c) **1.** To accuse. **2.** To implicate (oneself or another) in a crime or other wrongdoing; INCRIMINATE. — **inculpation,** *n.* — **inculpatory** (in-**kəl**-pə-tor-ee), *adj.*

**inculpatory evidence.** See EVIDENCE.

**incumbent** (in-**kəm**-bənt), *n.* (15c) Someone who holds an official post, esp. a political one. — **incumbency,** *n.* — **incumbent,** *adj.*

**incumbrance.** See ENCUMBRANCE.

**incur,** *vb.* (15c) To suffer or bring on oneself (a liability or expense). — **incurrence,** *n.* — **incurrable,** *adj.*

**incurable error.** See ERROR (2).

***in curia.*** [Latin] (16c) In court; into court.

***incurramentum*** (in-kə-rə-**men**-təm). [fr. Latin *in* "upon" + *currere* "to run"] (17c) *Hist.* The incurring of a fine or penalty.

**incurred risk.** See ASSUMPTION OF THE RISK (2).

***in cursu diligentiae*** (in **kər**-s[y]oo dil-ə-**jen**-shee-ee). [Law Latin] (17c) In the course of doing diligence — i.e., executing a judgment.

***in cursu rebellionis*** (in **kər**-s[y]oo ri-bel-ee-**oh**-nis). [Law Latin] (17c) In the course of rebellion.

> "In cursu rebellionis . . . . All persons were formerly regarded as in rebellion against the Crown who had been put to the horn for non-fulfilment of a civil obligation; their whole moveable estate fell to the Crown as escheat; they might be put to death with impunity; and lost all their legal privileges. If the denunciation remained unrelaxed for year and day (which was the time known as the *cursus rebellionis*), the rebel was esteemed *civiliter mortuus*, and his heritage reverted to the superior . . . . Denunciation for civil obligation and its consequences were in effect abolished by the Act 20 Geo. II. c. 50." John Trayner, *Trayner's Latin Maxims* 257 (4th ed. 1894).

***in custodia legis*** (in kə-**stoh**-dee-ə **lee**-jis). [Latin] (17c) In the custody of the law <the debtor's automobile was *in custodia legis* after being seized by the sheriff>. • The phrase is traditionally used in reference to property taken into the court's charge during pending litigation over it. — Also termed *in legal custody*.

***in damno vitando*** (in **dam**-noh vI-**tan**-doh). [Latin] (17c) In endeavoring to avoid damage (or injury).

***inde*** (**in**-dee), *adv.* [Latin] Thence; thereof. • This word appeared in several Latin phrases, such as *quod eat inde sine die* ("that he go thence without day").

***indebitatus*** (in-deb-i-**tay**-təs), *p.pl.* [Law Latin] (17c) Indebted. See NUNQUAM INDEBITATUS.

***indebitatus assumpsit*** (in-deb-i-**tay**-təs ə-**səm**[p]-sit). See ASSUMPSIT.

***indebiti solutio*** (in-**deb**-i-tI sə-l[y]oo-shee-oh). [Latin] (18c) *Roman & Scots law.* Payment of what is not owed. • Money paid under the mistaken belief that it was owed could be recovered by *condictio indebiti*. See *condictio indebiti* under CONDICTIO.

> "*Indebiti Solutio* — When a person has paid in error what he was not bound to pay the law lays upon the person who has received payment a duty of restitution. . . . Payment (solutio) includes any performance whereby one person has been enriched at the expense of another. Usually it will be the handing over of money or of some other thing, but it may also consist in undertaking a new liability or in discharging an existing liability." R.W. Lee, *The Elements of Roman Law* 373–74 (4th ed. 1956).

***indebitum*** (in-**deb**-i-təm), *n. & adj.* (17c) *Roman law.* A debt that in fact is not owed. • Money paid for a nonexistent debt could be recovered by the action *condictio indebiti*. Cf. DEBITUM.

> "A conditional debt if paid could be recovered as an *indebitum*, so long as the condition was outstanding." W.W. Buckland, *A Manual of Roman Private Law* 255 (2d ed. 1939).

**indebtedness** (in-**det**-id-nis). (17c) **1.** The quality, state, or condition of owing money. **2.** Something owed; a debt.

**indecency,** *n.* (16c) The quality, state, or condition of being outrageously offensive, esp. in a vulgar or sexual way. • Unlike obscene material, indecent speech is protected under the First Amendment. Cf. OBSCENITY. — **indecent,** *adj.*

> "*Obscenity* is that which is offensive to chastity. *Indecency* is often used with the same meaning, but may also include anything which is outrageously disgusting. These were not the names of common-law crimes, but were words used in describing or identifying certain deeds which were." Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 471 (3d ed. 1982).

**indecent advertising.** (1998) **1.** Signs, broadcasts, or other forms of communication that use grossly objectionable words, symbols, pictures, or the like to sell or promote goods, services, events, etc. **2.** *Archaic.* In some jurisdictions, the statutory offense of advertising the sale of abortifacients and (formerly) contraceptives.

**indecent assault.** (1861) *Criminal law.* The crime of making a sexual attack on someone by touching or threatening to touch the person, without engaging in rape. See *sexual assault* (2) under ASSAULT.

**indecent assault by contact.** See *sexual assault* (2) under ASSAULT.

**indecent assault by exposure.** See INDECENT EXPOSURE.

**indecent exhibition.** (1826) *Criminal law. Archaic.* The act of publicly displaying or offering for sale something (such

