# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:19-CV-00091-KDB

| | |
|---|---|
| IN RE:<br><br>LINA SUE CONKLIN,<br><br>DEBTOR. | (BANKRUPTCY CASE<br>NO. 18-30263) |
| KEVIN JUBER AND LINDA JUBER,<br><br>PLAINTIFFS,<br><br>V.<br><br>LIANA SUE CONKLIN,<br><br>DEFENDANT. | <u>ORDER</u><br><br>(ADVERSARY PROCEEDING<br>NO. 18-3026) |

**THIS MATTER** is before the Court on an appeal of a bankruptcy court ruling holding that a loan made by Appellants Kevin and Linda Juber (the "Jubers") to Appellee Lina Conklin ("Ms. Conklin"), their son's now former fiancé, to pay off student loans was dischargeable in Ms. Conklin's Chapter 13 bankruptcy. Bankruptcy law reflects a careful statutory balance between debtors and creditors. While the Bankruptcy Court's thoughtful and thorough opinion correctly holds that the law tips in favor of the debtor by requiring that all exemptions from discharge be read narrowly, applying the exemption in each particular case must still ultimately follow the statutory language. Here, the Court finds that the governing statute 11 U.S.C. § 523(a)(8)(B) and the facts clearly establish that the Jubers' loan would be nondischargeable if it is determined that the loan was "used to refinance" Ms. Conklin's original student loans (which the bankruptcy court has already held to be "qualified education loans"). Therefore, the Court will respectfully remand

1

this matter to the bankruptcy court to determine if the Jubers' loan is a "refinancing" of those loans and whether the loan is otherwise dischargeable in Ms. Conklin's Chapter 13 plan—issues that that bankruptcy court did not reach in the appealed order.

## I. BACKGROUND

### A. Relevant Facts

The parties largely agree about the factual circumstances surrounding this case and assert no objections to the findings of fact made by the bankruptcy court.[1] Rather, their disagreement centers on the proper interpretation and application of 11 U.S.C. § 523(a)(8)(B) to those admitted facts. Accordingly, the Court adopts the findings of fact made by the bankruptcy court, summarized below, in their entirety.

Ms. Conklin, the debtor, began attending college at the University of New Haven in the fall of 2009. (R. 59 p. 2).[2] She financed her studies with student loans from the Department of Education, private student loans from three different loan providers (the "Three Original Loans"), other grants, and scholarships from the university. (R. 59 p. 2). During her freshman year at college, she met the Jubers' son, Christopher "Kip" Juber ("the Jubers' Son"). (R. 59 p. 2). The two began dating shortly afterwards. (R. 59 p. 2). Ms. Conklin graduated from the University of New Haven in the spring of 2013, and she and the Jubers' Son became engaged a year later in December of 2014. (R. 59 pp. 2-3).

---

[1] During oral argument the Court asked each party's counsel if the party had any objections to the bankruptcy court's factual findings. Both parties expressed that they had no objections.
[2] The parties agreed upon a joint consolidated Record on Appeal. (Doc. No. 7). The consolidated Record on Appeal contains documents from the Chapter 13 proceeding and the adversary proceeding in chronological order. The parties assigned each document a number as indicated in the Index to the consolidated Record on Appeal. Citations to the Record on Appeal will be referred to as "R." for "Record," followed by the document number and page number. Citations to "Doc. No." refer to the documents as numbered on this Court's ECF docket.

Around the time of the engagement, the Jubers learned about the nature and extent of Ms. Conklin's Three Original Loans. (R. 59 p. 3). Ms. Conklin had approximately $100,000 in student debt remaining from the Three Original Loans with an average weighted interest rate of approximately 9.5%. (R. 50 p. 11; R. 59 p. 4). The Jubers wanted to help the couple start their married life in a strong financial position and began to think about how they could help the couple with Ms. Conklin's student debt. In early 2015, approximately one month after the Jubers' Son and Ms. Conklin became engaged, the Jubers, their son, and Ms. Conklin had a phone conversation during which the Jubers explained their proposal to help the couple. (R. 59 pp. 3-4).

The Jubers' offer to Ms. Conklin was twofold. First, the Jubers planned to activate their home equity line of credit (the "HELOC") to pay off the Three Original Loans. (R. 59 p. 4). The interest rate on the Jubers' HELOC was only 1.99%, compared to Ms. Conklin's 9.5% average interest rate. (R. 59 p. 4). The Jubers believed that by paying off Ms. Conklin's Three Original Loans with the HELOC, Ms. Conklin and their son would benefit from the lower interest rate and be able to have a lower principal balance when they married. (R. 59 p. 4). In return for paying off the Three Original Loans with the HELOC, the Jubers asked Ms. Conklin to agree to pay $500 biweekly until they decided to sell their home (the "Oral Loan"). (R. 59 p. 4). Because the Jubers planned to sell their home in the near future and would ultimately need to pay off the HELOC prior to closing, the plan was that Ms. Conklin and their son would refinance the remaining principal on the HELOC when the home was sold. (R. 59 pp. 4-5).

In November 2015, Ms. Conklin abruptly called off the engagement. (R. 59 p. 5). This triggered a litany of email exchanges between Ms. Conklin, the Jubers, and the Jubers' Son about how to handle the Oral Loan in light of the ended engagement. (R. 59 p. 5). The discussions led the Jubers and Ms. Conklin to enter into a written promissory note (the "Promissory Note") for the

3

debt she owed pursuant to the Oral Loan. (R. 59 p. 6). The terms of the Promissory Note were markedly different than the terms of the Oral Loan. Under the Promissory Note, Ms. Conklin agreed to repay the Jubers over a ten-year term at an interest rate of 9.5%, the weighted average of the interest rate of the Three Original Loans. (R. 59 pp. 6-7).

Ms. Conklin made relatively timely payments under the Promissory Note through January 2018. (R. 59 p. 7). However, in February 2018, the Jubers did not receive Ms. Conklin's loan payment, (R. 59 p. 7), and on March 2, 2018, Ms. Conklin emailed the Jubers notifying them that she had filed for Chapter 13 bankruptcy. (R. 50 p. 60; R. 60 p. 113). The parties' involvement in Ms. Conklin's bankruptcy proceeding resulted in the present dispute.

**B. Procedural History**

Ms. Conklin filed a Voluntary Petition for Chapter 13 Bankruptcy on February 20, 2018. (R. 1). She listed a student loan payment to FedLoan Servicing that she planned to pay directly, but did not separately classify or otherwise list any other student loans that would be dealt with through her plan as long-term debts. (R. 1; R. 59 p. 8). On March 17, 2018, the Jubers filed an unsecured proof of claim in the amount of $69,136.40 and stated that the basis of the claim was "Loan provided to refinance student loans." (R. 59 p. 8).

The Jubers filed an objection to the Chapter 13 plan on April 24, 2018, and an adversary proceeding on April 25, 2018 seeking to classify Ms. Conklin's indebtedness, as represented by the Oral Loan and the subsequent Promissory Note, as nondischargeable debt incurred as a refinance of a qualified education loan under § 523(a)(8) of the Bankruptcy Code and § 221(d) of the Internal Revenue Code. (R. 59 p. 7; R. 5; R. 6; R. 59 p. 8); *see* 11 U.S.C. § 523(a)(8)(B); 26 U.S.C. § 221(d)(1). Specifically, the adversarial complaint asked the bankruptcy court to declare the Jubers' loan to Ms. Conklin nondischargeable because, pursuant to 11 U.S.C. § 523(a)(8)(B),

the debt is "indebtedness . . . used to refinance indebtedness which qualifies as a qualified educational loan" under section 221(d) of the Internal Revenue Code. (R. 5; R. 59 p. 8). The Jubers' objection to confirmation of Ms. Conklin's Chapter 13 plan contended that the proposed plan "unfairly discriminated against them by proposing to pay during the Chapter 13 plan full contractual monthly educational loan repayments directly to the U.S. Department of Education while at the same time making payments on the Jubers' education loan inside the plan, pro rata with other general unsecured creditors, in violation of 11 U.S.C. § 1322(b)(1)."[3] (Doc. No. 9, at 7); *see also* (R. 1 pp. 26-29; R. 5 p. 2). The Jubers also contended that 11 U.S.C. § 1325(a)(1) prohibited confirmation and that the plan was not proposed in good faith.[4] (R. 5 pp. 2-3); (Doc. No. 9, at 7). On August 18, 2018, the bankruptcy court entered an order conditionally confirming Ms. Conklin's Chapter 13 plan, subject to its later ruling in the adversary proceeding. (R. 17).

The Jubers moved for partial summary judgment in the adversary proceeding on October 3, 2018, arguing that the Three Original Loans were "qualified education loans" as defined in 26 U.S.C. § 221(d)(1). (R. 18; R. 59 p. 9). Following briefing and a hearing on the Jubers' motion for summary judgment, the bankruptcy court granted the Jubers' motion for partial summary judgment on December 3, 2018, holding that Ms. Conklin's Three Original Loans were "qualified education loans" under 11 U.S.C. § 523(a)(8)(B). (R. 27; R. 59 p. 9).

The bankruptcy court conducted a trial in the adversary proceeding on January 25, 2019 on the issue of whether the Oral Loan to Ms. Conklin was nondischargeable pursuant to section 523(a)(8)(B) as a refinance of the Three Original Loans. (R. 50; R. 59 p. 9-10). On February 7,

---

[3] Title 11 U.S.C. § 1322(b)(1) states that a plan may "designate a class or classes of unsecured claims, . . . , but may not discriminate unfairly against any class do designated; . . . ."

[4] A plan that "complies with the provisions of this chapter and with the other applicable provisions of this title" shall be confirmed by the court. 11 U.S.C. § 1325(a)(1).

2019, the bankruptcy court verbally ruled that Ms. Conklin's debt to the Jubers did not qualify as a nondischargeable debt under 11 U.S.C. § 523(a)(8)(B). (R. 51). The Jubers filed a notice of appeal in the adversary proceeding and in the Chapter 13 proceeding on February 21, 2019 (R. 37, 57), and these appeals were later consolidated in October 2019.[5]

The bankruptcy court entered final Judgment and its written Findings of Fact, Conclusions of Law, and Order Granting Judgment to Ms. Conklin on August 26, 2019. (R. 59). The bankruptcy court concluded that the Jubers' loan to Ms. Conklin is dischargeable and should be treated as a general unsecured claim in Ms. Conklin's Chapter 13 case. (R. 59).

## II.   LEGAL STANDARD

Federal district courts have "original and exclusive jurisdiction in all cases under title 11," 28 U.S.C. § 1334(a), and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11," *id.* § 1334(b). District courts also have jurisdiction to hear appeals from final judgments and certain interlocutory orders from the bankruptcy court. 28 U.S.C. § 158(a). Bankruptcy courts have authority to enter final orders on issues deemed "core proceedings" arising in a case under title 11. 28 U.S.C. § 157(b). The determination of the dischargeability of a debt and an objection to discharge are core proceedings as defined by 28 U.S.C. § 157(b)(2)(I)-(J).

On an appeal from a bankruptcy court's order, the district court reviews the bankruptcy court's legal conclusions *de novo* and its factual findings for clear error. *Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 398 (4th Cir. 2005). When a case requires a conclusion regarding the legal effect of a bankruptcy court's factual findings, it presents a mixed question of

---

[5] While the notices of appeal were docketed on February 21, 2019, the appeals were not deemed "filed" until August 26, 2019, when the bankruptcy court issued its final written order. *See* Fed. R. Bankr. P. 8002(a)(2).

law and fact. *United States DHHS v. Smitley*, 347 F.3d 109, 115 (4th Cir. 2003) (quotation omitted). District courts review mixed questions of law and fact in bankruptcy appeals under a hybrid approach: "the ultimate conclusion of law is reviewed de novo but the supporting factual findings are reviewed for clear error." *CWCapital Asset Mgmt. v. Burcam Capital*, No. 5:13-CV-278-F, 2014 Dist. LEXIS 87900, at *7 (E.D.N.C. June 24, 2014) (citing *Smitley*, 347 F.3d at 116). The district court may affirm, modify, or reverse a bankruptcy court's order, or remand with instructions for further proceedings. *See* Fed. R. Bankr. P. 8013; *see also In re White*, 128 F. App'x 994, 999 (4th Cir. 2005).

With respect to statutory construction, the Court must "'first and foremost strive to implement congressional intent by examining the plain language.'" *Hurlburt v. Black (In re Hurlburt)*, 925 F.3d 154, 158 (4th Cir. 2019) (quoting *Minor v. Bostwick Labs., Inc.*, 669 F.3d 428, 434 (4th Cir. 2012)). "[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011) (citation omitted). Indeed, it is "a fundamental principle of statutory interpretation, . . . that we 'presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.'" *Tankersley v. Almand*, 837 F.3d 390, 395 (4th Cir. 2016). In interpreting the plain language of the statute, the Court also looks to "'the specific context in which the language is used, and the broader context of the statute as a whole.'" *In re Hurlburt*, 925 F.3d at 158 (quoting *Minor*, 669 F.3d at 434-35).

### III. DISCUSSION

The fundamental inquiry presented in this case is the proper reading of 11 U.S.C. § 523(a)(8)(B) as applied to the Jubers' loan to Ms. Conklin. The bankruptcy court held that every

7

loan—whether it be an initial loan or a "refinancing" of a loan—must first be an "educational loan" before analyzing whether a loan is a "qualified education loan." As explained below, the Court finds, based on the language of the statute, that so long as the loan being refinanced is a "qualified education loan," then the refinancing loan may still be considered nondischargeable debt under 11 U.S.C. § 523(a)(8)(B) whether or not it would itself be independently considered an "educational loan."

### A. The Statutory Language of Section 523(a)(8)

"Congress enacted the 1978 Bankruptcy Reform Act with the overarching goal of providing debtors with a 'fresh start.'" *In re Hurlburt*, 925 F.3d at 158 (citing H.R. Rep. No. 95-595, at 118 (1978)). However, the Bankruptcy Code contains several categories of debt that are not dischargeable in bankruptcy proceedings, including certain student loans. 11 U.S.C. § 523. The Bankruptcy Reform Act contained the first version of Section 523(a)(8), which specifically addresses the dischargeability of student loans. *See Essangui v. SLF V-2015 Tr. (In re Essangui)*, 573 B.R. 614, 617-20 (Bankr. D. Md. 2017) (reviewing the history of section 523(a)(8) and subsequent amendments). The version of section 523(a)(8) that is in effect today came from the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). *Id.* at 619.

The BAPCPA separated the initial language of section 523(a)(8) into two subsections, sections 523(a)(8)(A)(i) and (ii), and added a completely new section, section 523(a)(8)(B). *Id.* at 619-20. It reads:

> **(a) A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—**
> . . . .
> (8) **unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—**
> (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

>    (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
>
>    **(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual.**

11 U.S.C. § 523(a)(8)(emphasis added).

In this case, 11 U.S.C. § 523(a)(8)(A)(i) and (ii) do not apply. Those subsections address government-backed or nonprofit-funded educational benefit overpayments or student loans and "funds received as an educational benefit, scholarship, or stipend," which are typically private education loans or scholarships. *See Golden v. JP Morgan Chase Bank (In re Golden)*, 596 B.R. 239, 257 (Bankr. E.D.N.Y. 2019).

The only subsection at issue in this case is section 523(a)(8)(B). This subsection incorporates section 221(d) of the IRS Code, which defines a "qualified education loan" as:

> any indebtedness incurred by the taxpayer solely to pay qualified education expenses—
>   (A) which are incurred on behalf of the taxpayer . . . as of the time the indebtedness was incurred,
>   (B) which are paid or incurred within a reasonable period of time before or after the indebtedness is incurred, and
>   (C) which are attributable to education furnished during a period during which the recipient was an eligible student.
>
> Such term includes indebtedness used to refinance indebtedness which qualifies as a qualified education loan. The term "qualified education loan" shall not include any indebtedness owed to a person who is related (within the meaning of section 267(b) or 707(b)(1)) to the taxpayer . . . .

26 U.S.C. § 221(d)(1).

### B. The Bankruptcy Court's Order and the Jubers' Suggested Analysis

The bankruptcy court issued its written opinion on August 26, 2019, interpreting 11 U.S.C. § 523(a)(8)(B) and concluding that the Jubers' loan was a dischargeable debt. (R. 59). It based its opinion on three factors: (1) the statutory language; (2) the public policies underlying section

523(a)(8); and, (3) the legislative history behind section 523(a)(8). (R. 59 p. 12) ("While at first blush, the Oral Loan may appear to fall within the language of § 221(d), such a reading is contrary to longstanding canons of statutory interpretation, the public policies that motivated the passage of section 523(a)(8), and the legislative history surrounding § 523(a)(8).").

When looking at the statutory language of section 523(a)(8)(B), the bankruptcy court held that in determining whether the Jubers' loan is nondischargeable, the loan must first be an "educational loan." It noted that the Bankruptcy Code does not define the term "educational loan." (R. 59 p. 17). Being "hard-pressed" to find case law that establishes the "educational character" of a loan under § 523(a)(8)(B), the court looked at how the term "educational" is treated generally in the context of § 523(a)(8)(A). (R. 59 p. 18). In doing so, the court found that "case law exploring 'educational' loans under § 523(a)(8) typically examines how students spend loan money or assesses consolidation loans, sought out by borrowers, in hopes of securing better loan terms or rates." (R. 59 pp. 18-19).

The bankruptcy court went on to explain that not all monies provided to a student that ultimately pays for education expenses are considered "educational loans" under the Bankruptcy Code. (R. 59 p. 19). "For example, § 523(a)(8)(i) excepts loans by non-profits and the government only when they are made for an 'educational benefit.' Similarly, § 523(a)(8)(A)(ii) emphasizes that only those obligations to repay educational benefits, scholarships, or stipends are nondischargeable." (R. 59 pp. 19-20). Courts interpreting loans under section 523(a)(8)(A) must assess whether "the educational benefit at issue lacks the traditional characteristics of educational loans." (R. 59 p. 20).

The bankruptcy court then found that the Jubers' loan "lacks all of the traditional characteristics of a student loan and is more like the credit card debt and personal loans" that are dischargeable

under section 523(a)(8)(A)(ii). (R. 59 p. 21). The low interest rate, the fact that the loan came after Ms. Conklin had completed her education, and the lack of any mention of "student status" or educational purpose in the Oral Loan and Promissory Note led the bankruptcy court to hold that the Oral Loan was not an "educational loan" within the meaning of § 523(a)(8)(B). (R. 59 p. 21).

Next, the bankruptcy court looked to the legislative history and public policy behind the statute as further evidence that the Jubers' loan is dischargeable. (R. 59 pp. 21-29). It began by noting the difference between most loans and educational loans. Educational loans typically have higher risks for the creditor due to the debtor's usual lack of income or security. *See Andrews Univ. v. Merchant (In re Merchant)*, 958 F.2d 738, 740 (6th Cir. 1992) ("[U]nlike commercial transactions where credit is extended based on the debtor's collateral, income, and credit rating, student loans are generally unsecured and based solely upon the belief that the student-debtor will have sufficient income to service the debt following graduation.").

Section 523(a)(8) was passed to reduce abuses of the educational loan system and to ensure the longevity of the student loan program. (R. 59 p. 23)*; see also Santa Fe Med. Servs., Inc. v. Segal (In re Segal)*, 57 F.3d 342, 348 (3d Cir. 1995). "Although limited, the legislative history of section 523(a)(8) teaches that the exclusion of educational loans from the discharge provisions was designed to remedy abuses of the educational loan system by restricting the ability of a student to discharge an educational loan by filing for bankruptcy shortly after graduation." *In re Segal*, 57 F.3d at 348. Also, by making student loans nondischargeable in bankruptcy, Congress hoped it would incentivize lenders to lend to borrowers who would not otherwise qualify for loans. *See Gorosh v. Posner (In re Posner)*, 434 B.R. 800, 803 (Bankr. E.D. Mich. 2010).

The bankruptcy court interpreted this legislative history to mean that section 523(a)(8) was mainly meant to protect institutional lenders of student loans and thus should not be extended to

cover the Jubers' loan. (R. 59 p. 24) ("The Jubers are not the type of lenders that Congress intended to protect when they considered the backbone of the student lending infrastructure nationwide."). In support of this conclusion, the bankruptcy court cited the fact that not only were the Jubers not in the business of making loans but also that they reached out to Ms. Conklin and offered her more favorable loan terms (rather than her reaching out to them) and, most importantly, that the Jubers' motivation behind the loan was their parental desire to benefit their son so they would have lent the money to Ms. Conklin regardless of the reason she had incurred her debt.

Lastly, the bankruptcy court used the "substance of the transaction test" to consider the purpose of the Jubers' loan and whether it fits with the congressional intent of section 523(a)(8)(B). (R. 59 pp. 29-36). The substance of the transaction test is typically used when analyzing whether a loan is "educational" in nature under section 523(a)(8)(A) and the bankruptcy court admitted that this test has never before been used to analyze a loan under section 523(a)(8)(B). (R. 59 pp. 29-30). However, the bankruptcy court found it instructive in this case. In applying the substance of the transaction test to the Jubers' loan, the bankruptcy court held that the purpose of the loan was personal—to help their son—rather than educational, and therefore, was not meant to be protected as nondischargeable by Congress. (R. 59 p. 36).

In response to the bankruptcy court's analysis, counsel for the Jubers urged the Court at oral argument to adopt a two part test based on the statutory language to determine if the Jubers' loan was dischargeable under 11 U.S.C. § 523(a)(8)(B): (1) whether the underlying loans are qualified education loans (which the bankruptcy court has already decided); and (2) whether the indebtedness is a refinance under the plain meaning of the word "refinance." That is, the Jubers ask the Court to find that their loan need not itself be "educational" in nature to be a nondischargeable refinancing of the initial qualifying loans.

12

### C. Statutory Construction of 11 U.S.C § 523(a)(8)(B)

As stated above, the fundamental question presented in this case is the proper reading of 11 U.S.C. § 523(a)(8)(B). Recently, the Fourth Circuit provided guidance on the proper process for pursing this inquiry in its *en banc* review of a bankruptcy court and district court's decision interpreting a provision of the bankruptcy code. *See In re Hurlburt*, 925 F. 3d 154 (4th Cir. 2019). In *Hurlburt*, the court looked primarily at three considerations: (1) the most natural reading of the statutory language; (2) the effect of the prefatory language; and, (3) the statute's cross-reference to another provision of the bankruptcy code. *Id.* at 162-164. The Court finds each of these three factors instructive here.

To begin, the most natural reading of section 523(a)(8) is that a "qualified education loan" is a subset of "educational" loans. While all educational loans are not *qualified* education loans, all qualified education loans are plainly educational loans.[6] Thus, if a loan fits the definition of a "qualified education loan" under section 221(d)(1), then it is also a "educational loan" under section 523(a)(8)(B).

Looking at the language of 26 U.S.C. § 221(d)(1), the term qualified education loan includes "indebtedness used to refinance *indebtedness which qualifies as a qualified educational loan*." The bankruptcy court has already determined that the Three Original Loans were qualified education loans under section 221(d)(1). The parties do not challenge that ruling on appeal. Accordingly, indebtedness that is used to refinance those Three Original Loans is still a qualified educational loan that is nondischargeable under 11 U.S.C. § 523(a)(8)(B). "To be sure, courts are not bound to

---

[6] When asked at oral argument what types of loans would be considered educational loans, but would not be considered "qualified education loans," counsel for the Jubers answered that loans that exceed the costs of school attendance at an eligible institution, loans to a student who did not attend an eligible institution, or loans to a student who is not a taxpayer would likely be considered "educational loans" but do not fit into section 221(d)(1)'s definition of a qualified education loan.

adopt the most natural reading of statutory language. Nonetheless, when, as here, the most natural reading of statutory language supports a particular construction of that language, courts should be wary of adopting an alternative construction." *In re Hurlburt*, 925 F.3d at 162. In sum, the proper question is not whether the Jubers' loan was educational in nature, but rather whether the Jubers' loan is a *refinance* of the Three Original Loans, which would in turn make it a qualified education loan under 26 U.S.C. § 221(d)(1).

Further, the words "any other education loan" are prefatory language that introduces the substantive definition found in the IRS Code. The term "education loan" introduces the smaller subset of educational loans—qualified education loans as defined by 26 U.S.C. § 221(d)(1). After all, all loans governed by 11 U.S.C. § 523(a)(8) have some sort of connection to education. Thus, the cross-reference to section 221(d)(1) of the IRS Code is what provides the substantive definition. *See In re Hurlburt*, 925 F.3d at 163 (noting that cross-reference to "Section 1325(a)(5)(B) sets forth the *substantive* criteria a debtor's proposed plan must satisfy in order to be confirmed").

In support of its conclusion that section 523(a)(8)(B) requires that a loan be "educational" before it can be evaluated as a "qualified education loan," the bankruptcy court relied primarily on *In re Oliver*, 499 B.R. 617 (Bankr. S.D. Ind. 2013). However, the court's inquiry in *In re Oliver*— whether the debtor's failure to pay tuition and fees owed to a university was a *loan*—did not address the *educational* nature of the transaction (which was obvious in that context).[7] *See* 499 B.R. at 624-26. Unlike *In re Oliver*, there is no dispute that the transaction between the Jubers'

---

[7] Relying on a Seventh Circuit case with similar fact, the court in *In re Oliver* ultimately held that the unpaid tuition and fees were not a "loan" and, therefore, was dischargeable in the debtor's Chapter 7 bankruptcy plan. *In re Oliver*, 499 B.R. 624.

14

and Ms. Conklin constitutes a loan. (R. 59 p. 18) ("The parties do not dispute that the funds provided by the Jubers to pay off the Three Original Loans constituted a loan.").

The Court does not quarrel with the bankruptcy court's extensive discussion on the legislative history and policies behind the statute. However, the Court need not and does not reach the legislative history or public policy considerations because the language of the statute is clear and legislative history would only serve to "muddy clear statutory language." *In re Hurlburt*, 925 F.3d at 164 ("Because the plain language of [the statute is clear], we do not believe that it is proper to rely on legislative history to 'muddy [the] clear statutory language.'" (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011))); *see also United States v. Hatcher*, 560 F.3d 222, 226 (4th Cir. 2009) (noting that a court may rely on a statute's legislative history "[o]nly if [the court] determine[s] that the terms of a statutory provision are ambiguous"). [8]

As noted above, both the bankruptcy court's decision and Ms. Conklin's arguments reflect their belief that a fundamental distinction exists between institutional lenders and individual lenders with respect to the dischargeability of student debt. In their view, section 523(a)(8) was meant to protect institutional lenders in the business of making student loans from the often harsh realities of the student loan business, rather than individual lenders who, like the Jubers, are not in the business of making student loans. When asked at oral argument whether it would make a difference if the note at issue were held by an institutional lender in student loans, counsel for Ms. Conklin answered without hesitation that if the Jubers were institutional lenders, their loan to Ms. Conklin would not be dischargeable.

---

[8] Because the Court finds that the plain language of the section 523(a)(8)(B) is clear, it also need not reach review of the bankruptcy court's use of the "substantive transaction test." The Court does note that applying the "substance of the transaction" test to an analysis under section 523(a)(8)(B) is a novel approach, but does not find it necessary to address its application, if any, to 523(a)(8)(B) at this time.

The Court does not agree that a distinction between institutional and individual lenders can be found in the language of the statute. In fact, 26 U.S.C. § 221(d)(1) expressly excludes "any indebtedness to a person who is related," as defined in 26 U.S.C. §§ 267(b) or 707(b)(1). Under the applicable portions of 26 U.S.C. §§ 267(b) and 707(b)(1), related persons are members of a family, limited to siblings (whether whole or half blood), a spouse, ancestors, and lineal descendants.[9] This exception for related parties appears to clearly indicate that Congress meant to include within the reach of section 221(d)(1) individual unrelated persons, such as the Jubers, and not just banks or financial institutions who are in the "business" of making student loans. Also, this "related parties" exception would be superfluous if Congress meant to include only institutional lenders in refinances of qualified loans under § 221(d)(1).

Additionally, reading a distinction between institutional lenders and individual lenders into the statute would lead to inconsistent results. There is no dispute that the Jubers provided Ms. Conklin the loan for the purpose of paying off the Three Original Loans, which are admittedly educational in nature. So, if the Jubers had made the original loan, knowing the proceeds would go towards Ms. Conklin's future education, even Ms. Conklin would presumably agree that the loan would still be nondischargeable. It also seems clear from Ms. Conklin's argument and the bankruptcy court's opinion that if the Jubers had been an institutional lender in the business of student loans and executed the same loan, such debt would be nondischargeable under the statute because it would, in their view, fit with congressional intent to promote and protect the student loan business. Thus, under this analysis, the only difference between dischargeability and nondischargeability

---

[9] There is no dispute between the parties that the Jubers and Ms. Conklin are not related under this definition.

with respect to the Jubers' loan is the fact that the Jubers are individuals rather than professional lenders who loaned money to benefit their son.

The bankruptcy court relied heavily on the context and motivation behind the Jubers' decision to loan the money to Ms. Conklin, repeatedly stating that the Jubers' would have lent her the money for any reason, whether educational or not, because the purpose of the loan was to help their son. These motivational and contextual considerations are, however, nowhere to be found in the statutory language and the Court declines to read such factors into the statute. Other factors that the bankruptcy court discussed, like Ms. Conklin's payment history prior to the Jubers' paying off her loans, who sought out the loan, and who initially offered the loan are similarly absent from the statutory language and are therefore irrelevant to the analysis here. If Congress wants to exclude loans motivated by personal rather than commercial interests like the Jubers' loan to Ms. Conklin, Congress is solely responsible for enacting legislation to revise the statute. *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 52 (2008) (noting that "it is incumbent upon the Legislature, not the Judiciary, to determine whether [a statute] is in need of revision."); *In re Hurlburt*, 925 F.3d at 166 n.5 ("What the judiciary lacks authority to do is 'to substitute [its] view of policy for the legislation which has been passed by Congress.'").

Finally, while there is not dispute that the original loan (the "indebtedness which qualifies as a qualified educational loan") must be educational in nature, a refinance does not need to exhibit the same educational characteristics. Indeed, refinances almost never have the underlying purpose of funding a future education, a factor that the bankruptcy court emphasized in determining that the Jubers' loan was not educational in nature. Rather, the intent behind refinancing a loan is almost always simply an intent to reorganize the debt and to create better terms on the loan. Again, most significantly, the statutory language in section 221(d)(1) does not include any such limitations on

17

refinances—it simply states that the term qualified education loan "includes *indebtedness used to refinance* indebtedness which qualifies as a qualified education loan." Therefore, the Court overrules the bankruptcy court's conclusion that the Jubers' loan was dischargeable because it was not an "educational loan." So long as the loan being refinanced is a "qualified education loan," then the refinancing loan may still be considered nondischargeable debt under 11 U.S.C. § 523(a)(8)(B) whether or not it would itself be independently considered an "educational loan."

Although the Court finds that the Jubers' loan *may* qualify as a nondischargeable loan under section 523(a)(8)(B), that does not answer the ultimate question of whether the loan is dischargeable. First, the Jubers' must establish that their loan was a "refinance" under 26 U.S.C. § 221(d)(1). The bankruptcy court has not yet decided this critical issue, specifically noting that it did "not need to decide if the Oral Loan was a refinance of the Three Original Loans" because it held that the Jubers' loan did "not overcome the threshold language of section 523(a)(8)(B)[.]" (R. 59 p. 17). Nor has the bankruptcy court decided, even if the Jubers' loan is a qualified educational loan under 11 U.S.C. § 523(a)(8), whether under the statute the debt "would impose an undue hardship on the debtor and the debtor's dependents" such that it would be dischargeable in Ms. Conklin's Chapter 13 plan. The bankruptcy court is in the best position to decide these remaining issues in the first instance; therefore, the Court will remand this matter to the bankruptcy court to conduct further proceedings in accordance with this Order and to determine these outstanding questions.

## IV. ORDER

The bankruptcy court's conclusion that the Jubers' loan is not "educational in nature" and therefore dischargeable under section 523(a)(8)(B) is **REVERSED**. The matter is **REMANDED** to the bankruptcy court to conduct further proceedings consistent with this Order.

**SO ORDERED.**

Signed: April 6, 2020

Kenneth D. Bell
United States District Judge